**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Buenaventura MARTINEZ, Juan Martinez, Jaime B. Salcedo, Defendants-Appellants.**

**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Manuel SUAREZ–O'NEILL, Defendant-Appellee.**

**Nos. 83–5458, 83–5630.**

United States Court of Appeals, Eleventh Circuit.

June 24, 1985.

---

Jorge A. Sibila, Miami, Fla., for B. Martinez.

Luis Cruz, Miami, Fla., for J. Martinez.

Blas E. Padrino, Coral Gables, Fla., for J.B. Salcedo.

Stanley Marcus, U.S. Atty., Linda Collins Hertz, Robert J. Bondi, Asst. U.S. Attys., Miami, Fla., for the United States.

Thomas F. Almon, Jr., Miami, Fla., for Suarez-O'Neill.

Before HILL, KRAVITCH and SMITH,* Circuit Judges.

JAMES C. HILL, Circuit Judge:

Following a jury trial before the United States District Court for the Southern District of Florida, appellants Buenaventura Martinez, Juan Martinez, Jaime B. Salcedo, and codefendant/appellee Manuel Suarez-O'Neill were convicted of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846, possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2, and importation of cocaine into the United States in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) and 18 U.S.C. § 2.[1] The district court subsequently granted Suarez-O'Neill's motion for a new trial. Following submission of the case against Suarez-O'Neill to the judge, on the basis of the same evidence previously presented to the jury,[2] the district court entered a judgment of acquittal.

Appellants Buenaventura and Juan Martinez and Jaime Salcedo appeal their convictions. We reject their arguments and affirm the jury verdicts against them. The United States appeals the district court's judgment acquitting Suarez-O'Neill, claiming only that the motion for a new trial was erroneously granted. We hold that we have jurisdiction over the government's appeal and that the court erred when it granted the motion. We reverse the judgment of acquittal and reenter the original jury verdict of guilt.

I. APPELLANTS BUENAVENTURA
AND JUAN MARTINEZ, AND
SALCEDO: APPEAL OF CONVICTIONS

Appellants Buenaventura and Juan Martinez, and Salcedo challenge the' sufficiency of the evidence, the district court's refusal

---

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. The defendants' names are spelled several different ways in the record and the briefs on appeal. We spell their names as they appear in the indictment.

2. The government and defendant Suarez-O'Neill waived a jury trial and agreed to submit the case to the district court based upon the exact same testimony as that previously presented to the jury. They stipulated that, if called to testify, the witnesses' testimony would be the same as that previously heard by the jury.

to give a jury instruction on identification, and the district court's refusal to permit the jury to view the vessel. We reject these challenges.[3]

### A. Facts

On December 2, 1982, the M/V MAR AZUL arrived at Miami, Florida from San Andreas, Colombia, and docked on the Miami River at the Riverway Terminal. Beginning that evening, United States Customs Officers established a covert surveillance of the MAR AZUL and Riverway Terminal area from the roof of a nearby building.

At 8:00 p.m. the next evening, officers saw Juan Martinez and Vladimiro Mihalache Molarro ("Mihalache"), a codefendant not party to this appeal,[4] arrive in a Camaro Z 28, which they parked near the entry gate to the Riverway Terminal. Juan Martinez and Mihalache then spoke with the security guard at the Riverway Terminal, Buenaventura Martinez. No significant activity occurred between 8:00 p.m. and 11:00 p.m. The front gate of the Riverway Terminal remained closed and was not even opened when a van, loaded with carpet materials for the MAR AZUL, arrived to deliver them.

At 11:00 p.m., Buenaventura Martinez opened the front gate of the terminal, got into an Oldsmobile Cutlass parked outside, and drove it onto the dock area of the terminal. Juan Martinez and Mihalache then closed the front gate.

A few minutes later, the light, which had been illuminating the MAR AZUL, was shut off. A Customs Officer then saw Jaime Brawn Salcedo, a crewmember of the MAR AZUL, and two others on the aft deck area of the MAR AZUL. Mihalache and Juan Martinez were positioned on the dock at the bottom of the gangway to the MAR AZUL. Salcedo threw or slid two blue containers down the gangway. Mihalache and Juan Martinez took the containers. Buenaventura Martinez reopened the front gate and the white Oldsmobile, driven by Juan Martinez, with Mihalache as a passenger, exited the terminal. The security guard then closed the gate. Custom officials stopped the Oldsmobile, finding two blue containers filled with cocaine in the trunk.

Following the cocaine seizure, law enforcement officials proceeded into the Riverway Terminal area, where they arrested Suarez-O'Neill, captain of the MAR AZUL. Subsequent inspection of the vessel revealed 484 lbs. of cocaine hidden on board.

### B. Sufficiency of the Evidence

Appellants challenge the sufficiency of the evidence to sustain their convictions. In reviewing sufficiency of evidence claims, "we must examine the record in the light most favorable to the government, and in that light determine if a reasonable juror could find the defendants guilty beyond a reasonable doubt." *United States v. Corbin*, 734 F.2d 643, 650 (11th Cir.1984). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

### 1. Possession with intent to distribute and conspiracy to possess.

Focusing exclusively on their own testimony that they did not know cocaine

---

**3.** While all of the appellants clearly challenge the sufficiency of the evidence to sustain their convictions for possession and conspiracy to possess, only Juan Martinez argues that the evidence was insufficient with respect to importation and that the court erred by not giving the identification instruction, and only Salcedo challenges the court's refusal to permit the viewing. It is not clear whether appellants adopt each others' arguments. To the extent they do, the arguments are rejected as to them as well.

**4.** Mihalache, also known as Waldimaro Mittalachu, pled guilty to possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

was inside the containers or that criminal activity was in progress, appellants maintain the evidence was insufficient to establish that they had the criminal intent necessary to be convicted of possession or conspiracy to possess.[5] However, other evidence presented established appellants' participation in a carefully orchestrated and timed off-loading operation, revealing conduct by appellants that belies their protestations of innocent intent and lack of knowledge. Buenaventura Martinez, the security guard, refused to open the gate for a truck that arrived earlier in the evening to deliver rugs for the boat, but willingly opened the gate at 11:00 p.m. when he drove a car from outside the gate into the dock area. Once he parked the car in the dock area, containers filled with cocaine were put into its trunk. Buenaventura Martinez then reopened the gate to let the car, now loaded with cocaine, drive out.

Salcedo, a crewmember for the MAR AZUL, and Juan Martinez, brother of Buenaventura, were seen at the MAR AZUL at 11:00 p.m. taking the containers from the ship into the car. These activities, along with the facts that the activity began at 11:00 p.m. and that the lights illuminating the MAR AZUL suddenly were turned off as this off-loading operation began, indicate that appellants had knowledge of the drug conspiracy and, armed with such knowledge, acted in a manner that unmistakenly forwarded that conspiracy. Such evidence is amply sufficient to sustain convictions for possession and conspiracy to possess. *United States v. Lopez-Llerena*, 721 F.2d 311 (11th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 1602, 1913, 80 L.Ed.2d 132 (1984).

### 2. *Importation*

■ Appellant Juan Martinez argues the evidence was insufficient to sustain his conviction for importation because the evidence "does not exclude the possibility that the contraband was not brought into the United States from outside its territory." Brief of Appellant Juan Martinez at 9. However, the standard of review is not whether the evidence excludes every reasonable hypothesis of innocence, as appellant suggests, but rather whether, viewing the evidence in the light most favorable to the government, a reasonable person could find beyond a reasonable doubt that cocaine was brought into the United States from outside its borders. *Bell*, 678 F.2d at 549. We hold a reasonable person could so find. The evidence established that the MAR AZUL left Colombia destined for Miami. No indication was given that the ship stopped anywhere else in the United States prior to reaching the Riverway Terminal in Miami. It would thus be reasonable to conclude that the Riverway Terminal was the MAR AZUL's first and only stop in the United States. No indication was given that the MAR AZUL had contact with any ships, other than those of the Coast Guard, once it entered United States territory. Further, the vessel was under surveillance both the evening of its arrival in Miami and the following evening, which was when the off-loading activity occurred. The surveillants saw no loading activity. It would be reasonable to assume that no one would attempt to load 484 lbs. of cocaine in broad daylight, or would place so much cocaine on board the MAR AZUL while docked in Miami only to remove it a short time later. In the absence of any evidence indicating the MAR AZUL stopped in the United States prior to arriving at the Riverway Terminal, it was reasonable for the jury to conclude that the cocaine was brought into the United States from outside its borders.

■ Appellant Juan Martinez also argues that the evidence was insufficient because it showed, at most, that any involve-

---

**5.** Appellants Salcedo and Juan Martinez also claim that the evidence was insufficient to establish their physical participation or presence. However, these claims are frivolous. Customs officials testified that Salcedo rolled two containers down the gangplank, handing one to Mihalache and the other to Juan Martinez. Fur-

ther, Salcedo admitted in his testimony that he handed down at least one container, Trial Record, vol. 8, at 1048, and Juan Martinez admitted that he was present at the terminal at the time in question and that he drove away with the containers in the trunk of his car. *Id.* at 1009–16, 1025–28.

ment he may have had in the cocaine operation took place after the cocaine was already in the United States and thus after the importation had occurred. However, the crime of importation is not over the moment the controlled substance enters the United States. Importation is a " 'continuous crime' that is not complete until the controlled substance reaches its final destination point." *Corbin*, 734 F.2d at 652; *United States v. Gray*, 626 F.2d 494, 498 (5th Cir.1980), *cert. denied*, 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981). For this reason, it has been held, in circumstances that for all relevant purposes are identical to those here, that the importation was still in progress at the time the controlled substance was off-loaded in the United States. *Corbin*, 734 F.2d at 652. Thus, by participating in the off-loading, Juan Martinez, and the other appellants, participated in the importation. Given their coordinated efforts to off-load the vessel so recently after its arrival in Miami, it is reasonable to conclude that appellants knew cocaine had been imported and intended to import it. *Cf. id.* ("it would be reasonable for the jury to conclude that the appellants knew [the marijuana came from Colombia] ..., given their coordinated ef-

forts to off-load the boat in close conjunction with those physically responsible for bringing the marijuana into the country)."

### C. *Identification Instruction*

Appellant Juan Martinez asserts that his conviction should be reversed because the district court refused to give a jury instruction on identification of the accused, which provided, essentially, that the government must prove the identity of the defendant as the perpetrator of the alleged offenses.[6] Brief of Appellant Juan Martinez at 12. Juan Martinez claims that the instruction was necessary since he challenged the Custom Officer's testimony that it was he who off-loaded one of the containers.

▆ Appellant failed to object to the court's proposed jury instructions, and thus we must proceed under Federal Rule of Criminal Procedure 52(b), which permits reversal only for "plain error." *United States v. McCracken*, 488 F.2d 406, 413 (5th Cir.1974). We do not find any error, much less plain error, since the court's jury instructions concerning reasonable doubt and credibility of witnesses adequately covered the matter of identification.[7] *United*

---

**6.** Below, in full, is the instruction appellant Juan Martinez apparently wanted to be given:

In any criminal case the Government must prove not only the essential elements of the offense or offenses charged, as hereafter defined, but must also prove, of course, the identity of the Defendant as the perpetrator of the alleged offense or offenses.

In evaluating the identification testimony of a witness you should consider all of the factors already mentioned concerning your assessment of the credibility of any witness in general, and should also consider, in particular, whether the witness had an adequate opportunity to observe the person in question at the time or times about which the witness testified. You may consider, in that regard, such matters as the length of time the witness had to observe the person in question, the prevailing conditions at the time in terms of visibility or distance and the like, and whether the witness had known or observed the person at earlier times.

You may also consider the circumstances surrounding the identification itself including, for example, the manner in which the Defendant was presented to the witness for identifi-

cation, and the length of time that elapsed between the incident in question and the next opportunity the witness had to observe the Defendant.

If, after examining all of the testimony and evidence in the case, you have a reasonable doubt as to the identity of the Defendant as the perpetrator of the offense charged, you must find the Defendant not guilty.

Brief of Appellee United States, appendix.

**7.** As to credibility, the judge instructed the jury:

Now, you have as one of your responsibilities as you go about your ultimate responsibility of determining the issues of fact which I shall discuss with you later, part and parcel of it, to judge the believability, the credibility of the witnesses, to decide the weight, if any, that the testimony of the witness or witnesses deserves.

You should carefully consider all of the testimony given as you weigh the credibility of a witness or witnesses, the circumstances under which each witness has testified, every matter in evidence which tends to show whether or not that witness is worthy of belief.

*States v. Walker,* 720 F.2d 1527, 1541 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984) ("refusal to deliver a requested instruction constitutes reversible error only if the instruction is substantively correct *and* (1) it was not substantially covered in the charge actually delivered to the jury *and* (2) the failure to give it seriously impaired the defendant's ability to present an effective defense").

### D. *Viewing of Vessel*

 Appellant Salcedo claims that the district court committed reversible error by declining to order the jury to view the MAR AZUL. A decision regarding jury viewing is within the trial court's sound discretion and can be grounds for reversal only if that discretion is abused. *United States v. Bryant,* 563 F.2d 1227, 1230 (5th Cir.1977), *cert. denied,* 435 U.S. 972, 98 S.Ct. 1616, 56 L.Ed.2d 65 (1978). We find the district court's decision to be well within its discretion, especially since appellants were afforded, but declined, the court's invitation to offer into evidence a defense-produced video tape of the exterior and interior of the vessel.

> Consider the witnesses [sic] intelligence, motive, state of mind, demeanor or manner while testifying.
> Consider the witness' ability to observe the matters as to which he has testified, whether he impresses you as having an accurate recollection of those matters.
> Consider any relation each witness may bear to either side of the case and consider the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.
> Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to discredit such testimony.
> In weighing the effect of any discrepancy, always consider whether it pertains to a matter of importance or to an unimportant detail and whether any such discrepancy results from innocent error or from intentional falsehood, and after making your own judgment, give the testimony of each witness that degree of credibility, of believability, if any, as you find it deserves.
> The testimony of a Government agent, a law enforcement officer is to be considered by you under the same tests and given the same consideration as that of any other witness.

## II. GOVERNMENT'S APPEAL: NEW TRIAL ORDER

Two issues are raised by the government's appeal of the trial court's judgment acquitting Suarez-O'Neill. First, whether we have jurisdiction over the appeal. Second, whether the district court erred by granting the new trial motion.

We begin by setting forth the relevant facts. We then consider the jurisdictional question, determining that we have the authority to hear this appeal. Finally, we reach the merits, holding that the district court erred.

### A. *Facts*

Suarez-O'Neill, the captain of the MAR AZUL, was arrested at the Riverway Terminal on December 3, 1982, soon after Juan Martinez and Mihalache were stopped in the Oldsmobile. His main defense at trial, which began March 7, 1983, was that he did not know there was cocaine on board the MAR AZUL.

The local standing discovery order required the government to supply the de-

Trial Record, vol. 13, at 69–70.
> As to reasonable doubt, the judge instructed:
> Now, it is not required that the Government prove its case beyond all possible doubt. The test is that of reasonable doubt.
> A reasonable doubt is a doubt based upon reason and common sense, it is the kind of doubt that would make a reasonable person hesitate to act.
> A reasonable doubt is not a vague, a speculative, an imaginary doubt.
> It is such a doubt as would cause prudent men and women to hesitate before acting in matters of importance to themselves.
> You must remember that a defendant is never to be convicted on suspicion or conjecture and that the burden is always upon the prosecution to prove the charge beyond a reasonable doubt.
> That burden never shifts to a defendant. The law never imposes upon a defendant the burden or duty of calling any witnesses or producing any evidence.
*Id.* at 92.
> We also note that Juan Martinez's counsel argued that government agents erroneously identified Juan Martinez as the recipient of one container of cocaine from Salcedo, claiming obstructed view, darkness, and lack of time. *Id.,* vol. 12, at 105–06.

fendant with "[t]he substance of any oral statement made by the defendant before or after his arrest in response to interrogation by a then known to be government agent which the government intends to offer in evidence at trial." Record, vol. 1, at 26. Pursuant to this order, the government sent Suarez-O'Neill a letter on December 27, 1982, that supplied, among other things, a series of oral statements by the defendant, including his statement that "they were the holding tanks and they directly fed the diesel engine in the engine room." No indication was given of the question to which this was a response.

On Friday, March 11, 1983, four days after the trial began, defendant's counsel received Jencks Act material from the government that revealed for the first time the context in which his client had made the comment about the holding tanks. The Jencks Act material indicated that shortly after a search of the MAR AZUL had revealed cocaine hidden in, among other places, the fuel oil holding tanks in the engine room, Special Agent Burns of the Drug Enforcement Administration had asked Suarez-O'Neill "if he knew what the name of or what the purpose of the tanks were in the engine room where the cocaine was found." It was in response to this question that Suarez-O'Neill had said "they were the holding tanks and they directly fed the diesel engine in the engine room." The government intended to show that there were three other types of tanks, besides the holding tanks, in the engine room, and that prior to Agent Burns' question, no one had told Suarez-O'Neill where the cocaine was found. Based on this evidence, the government planned to show that Suarez-O'Neill must have had first-hand knowledge that there was cocaine aboard the MAR AZUL.

Recognizing that Suarez-O'Neill's statement would hurt his defense, his counsel moved to suppress the statement, apparently on the ground that the government had violated the discovery order by not supplying Agent Burns' question until well into the trial.

The court then took a weekend recess and on Monday, March 14, the government advised the court that it was ready to call Agent Burns to testify about defendant's comments regarding the holding tanks. The court denied the motion to suppress, and Burns was allowed to testify.

Burns was the government's last witness. The court recessed early Monday afternoon and scheduled trial to resume Tuesday at 1:00 p.m., at which time the defense began its case.

The defense put on as its first witness an expert in naval architecture, who testified about the different types of tanks in the engine room and their purposes. The defense used this testimony to support its contention that the holding tanks containing the cocaine did not "directly fe[e]d the diesel engine." Suarez-O'Neill testified to a different version of his conversation with Burns, claiming Burns told him the cocaine was found in the fuel tanks and then asked him what the tanks in the engine room were used for. He also testified that, prior to answering Agent Burns question, he had heard Customs Patrol Officer Benavente say that cocaine had been found in the fuel tanks in the engine room. Officer Benavente testified, during the government's rebuttal, that he had never mentioned where the cocaine had been found. In their respective closing arguments, both the prosecutor and defense counsel referred to the purposes of the holding tanks and the inferences to be drawn from the testimony about what Suarez-O'Neill had said and not said.

The jury found Suarez-O'Neill guilty. Suarez-O'Neill then moved for a new trial or judgment of acquittal, alleging eleven grounds. One of the grounds was that the verdict was contrary to the weight of the evidence. The last six grounds related in some fashion to the government's failure to advise the defense of Agent Burns' question prior to trial.[8] The court denied the

---

**8.** These six grounds were:

**6.** The Court erred in denying the defend-

motion for judgment of acquittal, and granted a new trial, without stating any reasons.

At the new trial, which was a bench trial, Suarez-O'Neill was acquitted. Following the acquittal, the government filed notice of appeal, challenging the judgment of acquittal solely on the ground that the new trial motion was erroneously granted. Defendant/appellee Suarez-O'Neill filed a motion to dismiss for lack of jurisdiction. We ordered that the motion be carried with the case.

### B. *Jurisdiction*

Initially, we must address the issue of whether we have jurisdiction over this appeal from a final judgment of acquittal entered upon retrial, where the defendant was convicted at the first trial and the sole ground of attack on appeal is that the trial court erroneously granted the motion for a new trial.[9]

For this court to have jurisdiction of a government appeal in a criminal case, two statutory requirements usually must be met. First, the government must be authorized to bring the appeal under 18 U.S.C. § 3731, which specifies the circumstances in which the government has the right to appeal from an adverse ruling in a criminal case. *United States v. Wilson*, 420 U.S. 332, 336–37, 95 S.Ct. 1013, 1018–19, 43 L.Ed.2d 232 (1975). *See also United States v. Sanges*, 144 U.S. 310, 312, 12 S.Ct. 609, 610 (1892) (government cannot appeal in a criminal case without express congressional authorization). Second, the decision being challenged must constitute a "final judgment" within the meaning of 28 U.S.C. § 1291, which provides that courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts...." Typically, both requirements must be met: the first ensures that the

---

ant's Motion for Mistrial based upon improper and inflammatory statements made by the prosecutors during the trial, and, in particular during closing argument.

7. The Court erred in denying defendant's Motion to Suppress the purported substance of an oral statement allegedly made by the defendant in response to interrogation by D.E.A. Special Agent Burns shortly after his arrest, grounded upon a violation of the Standing Discovery Order, and a violation of Rule 16 of the Federal Rules of Criminal Procedure.

8. The prosecutor is guilty of misconduct by deliberately and intentionally misleading the defense as to the true and accurate substance of the purported substance of an oral statement made by the defendant in response to interrogation by Special Agent Burns as indicated by a comparison of the correspondence to defense counsel dated December 27, 1982, marked Exhibit "A", attached hereto, and the Jencks material which had been supplied to defense counsel during the course of the trial, namely, the grand jury testimony of U.S. Customs Agent George Nimmoor, marked Exhibit "B", attached hereto, and the notes of D.E.A. Special Agent Burns, marked Exhibit "C", attached hereto.

9. The Court erred in denying the defendant's Motion to Dismiss the Indictment grounded upon prosecutor's misconduct, bad faith, violation of the Standing Discovery Order and violation of Rule 16 of the Federal Rules of Criminal Procedure with respect to the defendant's purported oral statement.

10. The defendant was denied Due Process of law as guaranteed by the Fifth Amendment to the United States Constitution based upon the prosecutor's deliberate and intentional suppression of the true and accurate content and substance of a purported oral statement by the defendant after his arrest, in response to interrogation by a government agent.

11. The Court erred in denying the defendant's Motion to Suppress the purported oral statement allegedly obtained from the defendant shortly after his arrest in response to a government agent's interrogation on the ground that said purported oral statement was not supported by an independent prima facie of the corpus delicti of the crimes for which the defendant has been charged.
Supp. Record, vol. 2, at 18–20.

9. Appellant government characterizes the nature of this appeal differently than we do here, suggesting repeatedly that this is an appeal of a new trial order and not of a judgment of acquittal. Were this actually the nature of the government's appeal, then even if we had jurisdiction, we would not decide the case since our decision would be an advisory one only. No matter what we decided about the new trial order, that final judgment of acquittal would remain intact and untouched since it was not appealed. We do not believe the government intended to put this case in such a posture: its notice of appeal refers to the judgment of acquittal, and the relief sought is vacation of the acquittal and reentry of the jury verdict of guilty. We, thus, believe that our description of the nature of this appeal is the more accurate one.

government is permitted to bring the appeal; the second that the challenged order itself is appealable.[10] *Accord United States v. Dior*, 671 F.2d 351, 355 (9th Cir. 1982).

Under the law in effect at the time of this action, the government could not have appealed the new trial order at the time it was granted.[11] The order failed to meet either of the above requirements. The former fifth circuit held that section 3731 did not authorize a government appeal of a new trial order. *United States v. Hitchmon*, 602 F.2d 689, 692 (5th Cir.1979). *Accord United States v. Alberti*, 568 F.2d 617, 621 (2d Cir.1977); *United States v. Taylor*, 544 F.2d 347, 349 (8th Cir.1976). *Cf. United States v. Fernandez-Toledo*, 737 F.2d 912, 919 (11th Cir.1984) (section 3731 "only covers orders regarding pretrial discovery and suppression of evidence questions and orders constituting a termination of the case such as dismissals of an indictment or judgments of acquittal"). Courts unanimously held, in both civil and criminal cases, that a new trial order was interlocutory and thus failed to meet the "final judgment" requirement of section 1291. *E.g., Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34, 101 S.Ct. 188, 189, 68 L.Ed.2d 193 (1980); *United States v. Draper*, 746 F.2d 662, 664 (10th Cir. 1984); *United States v. Sam Goody, Inc.*,

675 F.2d 17, 20–25 (2d Cir.1982); *Hitchmon*, 602 F.2d at 691–92; *Taylor*, 544 F.2d at 349.

The question presented by this case is whether the result is different if the government waits until a judgment has been entered upon retrial to challenge the new trial order, so that the appeal is no longer from the new trial order as such, but rather from the judgment of acquittal on the ground that the new trial motion was erroneously granted.

1. *Section 3731: statutory authority.*

At the time relevant to this case, 18 U.S.C. § 3731 specified only two categories of decisions that the government could appeal in a criminal case: (1) a "decision or order of a district court suppressing or excluding evidence or requiring the return of seized property ..." and (2) "a decision, judgment or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution."[12] The statute also provided that it "shall be liberally constructed to effectuate its purposes." The Supreme Court determined that one such purpose was "to remove all statutory barriers to Government appeals and to al-

10. Section 3731 can, and does, make it lawful for the government to take certain appeals even though there is no final judgment. For example, section 3731 expressly authorizes the government to appeal interlocutory suppression orders under certain circumstances. However, Congress intended for section 3731 to waive the final judgment requirement of section 1291 in certain limited circumstances only. It did not intend for section 3731 to eliminate the final judgment requirement entirely. Thus, unless the right to take an interlocutory appeal is expressly provided in section 3731, government appeals must satisfy the final judgment requirement of section 1291 as well as the requirements of section 3731. *E.g., United States v. Dior*, 671 F.2d 351, 355–56 (9th Cir.1982); *United States v. Sam Goody, Inc.*, 675 F.2d 17, 23 (2d Cir.1982).

11. On October 12, 1984, the President signed into law the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, which, among other

provisions, makes it permissible for the government to appeal from an order of a district court granting a new trial after verdict or judgment. At least one court has held that this law may apply retrospectively to new trial orders entered prior to October 12, 1984. *Nilson Van & Storage Co. v. Marsh*, 755 F.2d 362 (4th Cir.1985). Even if we were to adopt such a rule, it would not aid us in this case since the government did not file a notice of appeal from the new trial order within thirty days of that order, nor within thirty days of the district court's order denying the government's motion for reconsideration of its new trial order. *See United States v. Dieter*, 429 U.S. 6, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976); Federal Rule of Appellate Procedure 4(b).

12. In October of 1984, section 3731 was amended to afford the government a right of appeal from an order of a district court "granting a new trial after verdict or judgment." *See also* contents of footnote 11.

low appeals whenever the Constitution would permit." *Wilson*, 420 U.S. at 337, 95 S.Ct. at 1019. *See also United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568, 97 S.Ct. 1349, 1352, 51 L.Ed.2d 642 (1977).

Despite the "liberal construction" provision of section 3731, courts had held that section 3731 did not authorize the appeal of a new trial order, since "[s]uch an order does not '[dismiss] an indictment ... as to any one or more ... counts,'" as required by the explicit language of the statute. *Alberti*, 568 F.2d at 621. *See also Hitchmon*, 602 F.2d at 692. However, courts had been willing to extend the government's section 3731 right of appeal beyond the explicit language of the statute when it came to judgments of acquittal. Courts held that section 3731 authorized a government appeal of a judgment of acquittal as long as the appeal was not barred by the Double Jeopardy Clause. *Martin Linen Supply Co.*, 430 U.S. at 568, 97 S.Ct. at 1352; *United States v. Boyd*, 566 F.2d 929, 931–33 (5th Cir.1978). *Cf. Fernandez-Toledo*, 737 F.2d at 919 (section 3731 coverage is limited to "orders regarding pretrial discovery and suppression of evidence questions, and orders constituting a termination of the case such as dismissals of an indictment or judgments of acquittal"). Thus, even though section 3731 did not authorize the appeal of a new trial order, it may have authorized the instant appeal, which is of a judgment of acquittal, as long as this appeal is permitted by the Double Jeopardy Clause. Thus, the crucial question here is whether the Double Jeopardy Clause permits this appeal.

▮ There is no blanket rule that the Double Jeopardy Clause bars all appeals from judgments of acquittal. For, the policy behind that clause is not to prevent government appeals, but rather to prevent multiple prosecutions. *Wilson*, 420 U.S. at 342–44, 95 S.Ct. at 1021–22. As the Supreme Court has explained,

> At the heart of this policy [against multiple trials] is the concern that permitting the sovereign freely to subject the citizen to a second trial for the same offense would arm Government with a potent instrument of oppression. The Clause, therefore, guarantees that the State shall not be permitted to make repeated attempts to convict the accused, 'thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.'

*Martin Linen Supply Co.*, 430 U.S. at 569, 97 S.Ct. at 1353 (quoting *Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957)). Thus, the test for whether a government appeal of a judgment of acquittal is barred by the Double Jeopardy Clause is whether there will be any proceeding after a successful appeal that would require the resolution of further factual issues by the trier of fact. *Id.* 430 U.S. at 570, 97 S.Ct. at 1354. *Cf. United States v. Scott*, 437 U.S. 82, 91 n. 7, 98 S.Ct. 2187, 2194 n. 7, 57 L.Ed.2d 65 (1978) ("We ... assume[ ] a judgment of acquittal could be appealed where no retrial would be needed on remand"). So, for example, in *Wilson*, 420 U.S. at 342–53, 95 S.Ct. at 1021–26, the Court held that, where the jury had found the defendant guilty, the Double Jeopardy Clause did not bar a government appeal of a trial judge's post-verdict dismissal of the indictment, since reversal on appeal would simply reinstate the jury verdict, not subject him to another trial. In *Martin Linen Supply Co.*, 430 U.S. at 567, 97 S.Ct. at 1352, the Court held that, where the jury had been deadlocked, the Double Jeopardy Clause did bar a government appeal from a judgment of acquittal entered by a trial judge on the defendant's motion after he discharged the deadlocked jury. Under those circumstances, reversal on appeal would not simply reinstate a prior verdict; factual issues would remain unresolved. *Id.* at 570–71, 97 S.Ct. at 1354. Similarly, it is well-established in our circuit and others that the government constitutionally may appeal post-verdict judgments of acquittal not-

withstanding the verdict after the jury rendered a guilty verdict, since reversal on appeal will simply reinstate the prior judgment of conviction and not subject defendant to another prosecution. *E.g., United States v. Black,* 644 F.2d 445, 446–47 (5th Cir.1981); *United States v. Burns,* 597 F.2d 939, 940 (5th Cir.1979); *United States v. Boyd,* 566 F.2d at 931–33 (5th Cir.1978); *Accord United States v. Singleton,* 702 F.2d 1159, 1161–62 (D.C.Cir.1983); *United States v. Steed,* 674 F.2d 284, 285–86 (4th Cir.) *(en banc), cert. denied,* 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982); *United States v. Blasco,* 581 F.2d 681, 682–84 (7th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978); *United States v. Jones,* 580 F.2d 219, 221–22 n. 3 (6th Cir.1978); *United States v. Calloway,* 562 F.2d 615, 616–17 (10th Cir.1977); *United States v. Cahalane,* 560 F.2d 601, 603 n. 2 (3d Cir.1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *United States v. Rojas,* 554 F.2d 938, 941–42 (9th Cir.1977); *United States v. De Garces,* 518 F.2d 1156, 1159 (2d Cir.1975).

Applying the double jeopardy test here, it would seem that double jeopardy does not bar this appeal, since reversal on appeal would not lead to another trial but to reinstatement of the original jury verdict. In civil cases, the courts routinely vacate the final judgment and reinstate the original verdict when they determine new trial motions were erroneously granted. *E.g., Juneau Square Corp. v. First Wisconsin National Bank of Milwaukee,* 624 F.2d 798, 806 (7th Cir.1980); *Wiggs v. Courshon,* 485 F.2d 1281, 1283 (5th Cir.1973), *cert. denied,* 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980). We see no reason why the result should be different in the criminal context.

Appellee nonetheless maintains the Double Jeopardy Clause bars this appeal because the judgment of acquittal here was not based on a ruling of law by the court that the evidence was insufficient to sustain a conviction, but rather on the verdict of not guilty entered by the court as factfinder. Appellee claims that this distinguishes the instant appeal from the longline of cases, cited above, in which the courts have held that double jeopardy does not bar appeals of judgments of acquittal notwithstanding the verdict. It is thus appellee's position that judgments of acquittal based on findings of fact, as opposed to rulings of law, are never appealable by the government. However, we find no support in any Supreme Court or circuit court decisions for this contention.[13] As indicated above, the courts have repeatedly indicated that the focus of the inquiry in seeking to

**13.** Appellee relies on *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), and *Martin Linen Supply Co.,* 430 U.S. at 571, 97 S.Ct. at 1354. However, the Supreme Court has clearly stated that *Ball* does not support appellee's position, but rather supports the position that the Double Jeopardy Clause forbids government appeals that could result in another trial for the accused:

> Respondent contends that *Ball* ... stand[s] for the proposition that the key to invoking double jeopardy protection is not whether the defendant might be subjected to multiple trials, but whether he can point to a prior verdict or judgment of acquittal. In *Ball,* however, the Court explained that review of the verdict of acquittal was barred primarily because it would expose the defendant to the risk of a second trial after the finder of fact had ruled in his favor in the first.

*Wilson,* 420 U.S. at 346–47 [95 S.Ct. at 1023–24]. *Green* also involved a situation where the accused faced a second trial, rather than reinstatement of a prior factual finding. In *Martin Linen Supply Co.,* 430 U.S. at 570–71 [97 S.Ct. at 1354–55], the Court made it clear that, had a successful government appeal not necessitated another trial, appeal of the judgment of acquittal would have been permitted:

> None of the considerations favoring appealability is present in the case of a Government appeal from the District Court's judgments of acquittal under Rule 29(c) where the jury failed to agree on a verdict.... [A] successful governmental appeal reversing the judgments of acquittal would necessitate another trial, or, at least, 'further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged....' *United States v. Jenkins,* 420 U.S. 358, 370 [95 S.Ct. 1006, 1013, 43 L.Ed.2d 250] (1975). Therefore, the present case is not one where the double jeopardy bar to appealability is automatically averted.

determine whether double jeopardy permits the government to appeal a decision favorable to the defendant is whether, if reversed, there is any need for further factual findings. *Cf. Blasco*, 581 F.2d at 683–84 (Seventh Circuit held Double Jeopardy Clause did not bar government appeals of judgments of acquittal notwithstanding the jury's verdict of guilt, maintaining the sole focus of the double jeopardy inquiry is whether, if reversed, further factfindings are necessary, and rejecting the argument that "while the government may have the right to appeal where the judge's ruling is based on purely legal considerations, here the ruling was on 'solely evidentiary factual considerations' and the government therefore has no right of appeal").

■ Of course, if the government were to challenge the instant final judgment of acquittal on any ground other than that the new trial motion was erroneously granted, the Double Jeopardy Clause presumably would bar the appeal. If, for example, the government challenged the judgment alleging erroneous evidentiary rulings at the second trial, then a decision favorable to the government would leave the defendant open to a subsequent trial. However, if the only error alleged on appeal is the granting of the new trial motion, then reversal would not lead to another prosecution but reinstatement of a jury verdict. We thus hold that the Double Jeopardy Clause does not bar this appeal, and that

section 3731 authorizes this appeal of a judgment of acquittal.[14]

### 2. *Section 1291: appealability of challenged order.*

■ Unlike a new trial order, a judgment of acquittal is a final order for purposes of section 1291: " 'it terminates the litigation between the parties on the merits of the case, and leaves nothing to be done but to enforce by execution what has been determined.' " *Parr v. United States*, 351 U.S. 513, 518, 76 S.Ct. 912, 916, 100 L.Ed. 1377 (1956) (*quoting St. Louis, Iron Mountain & Southern Railroad Co. v. Southern Express Co.*, 108 U.S. 24, 28, 2 S.Ct. 6, 8, 27 L.Ed. 638 (1883)). *See also Sam Goody, Inc.*, 675 F.2d at 20.

■ In civil cases, an order granting a new trial may be reviewed on the appeal from the final judgment entered on the retrial. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980); *Juneau Square Corp.*, 624 F.2d at 806; *Wiggs*, 485 F.2d at 1283. Given that the Double Jeopardy Clause does not bar the instant appeal from the final judgment of acquittal, there seems no reason why the civil rule should not be applied. Thus, the final judgment requirement of section 1291 is satisfied and the new trial order may be reviewed.

■ To summarize our holdings regarding jurisdiction, this appeal meets the stat-

14. Our conclusion is bolstered by the fact that courts have for some time suggested in *dicta* that the Double Jeopardy Clause does not bar appeals of new trial orders. *E.g., Dior*, 671 F.2d at 356 ("Were a new trial order appealable under section 1291, the Government's right to prosecute the appeal under section 3731 would be well taken since there appears to be no constitutional barriers to such an appeal"); *Sam Goody, Inc.*, 675 F.2d at 22 ("Nor are we concerned in the present circumstances with double jeopardy restrictions on the government's right to appeal in a criminal case. Since the jury had rendered verdicts of guilty, the government does not seek to put the defendants through the ordeal of repeated prosecution; the appeal [of the grant of a new trial], if sustained, would simply require the reinstatement of the verdicts already obtained"). Also, Congress recently authorized

government appeals of new trial orders, stating, "to authorize appeal of a post-conviction new trial order is constitutionally permissible, since a successful government appeal would merely result ... in the reinstatement of the conviction, not a second trial." S.Rep. No. 225, 98th Cong., 1st Sess. 405 (1983). Of course, the instant case is a bit different from the situation described by the authorities above. Here a final judgment of acquittal has been entered on retrial, and it is that final judgment, not the new trial order, that is being appealed. However, since the granting of the new trial motion is the sole bone of contention, the result is the same as when a new trial order is itself being appealed: reinstatement of the prior verdict of guilt, with no further factual findings needed. It is this result that is the key for double jeopardy purposes.

utory requirements of sections 3731 and 1291. Thus, this court has jurisdiction.

### C. Merits

#### 1. Standard of review

■■ There is no reported opinion determining the appropriate standard of review of an order granting a new trial in a criminal case. We hold that an abuse of discretion standard of review is to be applied. A motion for a new trial is addressed to the sound discretion of the trial court, since Federal Rule of Criminal Procedure 33, which governs new trial motions, permits the court to grant a new trial "in the interest of justice." Further, abuse of discretion is the standard of review applied in civil cases, *Juneau Square Corp.*, 624 F.2d at 806, and in criminal cases where denial of a new trial motion is challenged, *United States v. Russo*, 717 F.2d 545, 550 (11th Cir.1983).

#### 2. Application of the standard

■■ The district court did not specify its reasons for granting the new trial motion. However, it appears the court must have done so on the grounds that the jury verdict was contrary to the weight of the evidence and/or the government violated the discovery order by not disclosing Agent Burns' question prior to trial.[15] We hold that to grant a new trial motion on the basis of either or both of these grounds was, under the facts of this case, an abuse of discretion.

#### a. Weight of the Evidence

■■ Initially, we note that a motion for new trial made on the ground that the

verdict is contrary to the weight of the evidence raises issues very different from a motion for judgment of acquittal notwithstanding the verdict, which is based on the sufficiency of the evidence. On a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the verdict, and, under that light, determine whether the evidence is sufficient to support the verdict. *Corbin*, 734 F.2d at 650. Thus, on this motion, the court assumes the truth of the evidence offered by the prosecution. On a motion for a new trial based on the weight of the evidence, the court need not view the evidence in the light most favorable to the verdict. It may weigh the evidence and consider the credibility of the witnesses. *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980); *United States v. Simms*, 508 F.Supp. 1188, 1202 (W.D.La. 1980). If the court concludes that, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Lincoln*, 630 F.2d at 1319.

■■ The decision to grant or deny a new trial motion based on the weight of the evidence is within the sound discretion of the trial court. An appellate court may reverse only if it finds the decision to be a clear abuse of that discretion. *Id.; United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir.1979). While the district court's discretion is quite broad, there are limits to it. The court may not reweigh the evidence and set aside the verdict simply because it

---

**15.** In his brief, appellee suggests, in passing, that the motion might have been granted because "it is obvious from a reading of the transcript that the Captain's testimony was extremely undermined before the jury by the tactics of the co-defendants who gave completely ridiculous explanations for their proven involvement with the cocaine." Brief of Appellee Suarez-O'Neill at 28. He suggests that this deprived him of a fair trial. We refuse to consider this as a possible ground for the new trial order. Appellee did not state this as a basis for a new trial

in his motion, probably because he had not filed a motion for severance at any time prior to moving for the new trial. The district court gave no indication that this was the basis on which it granted the new trial. We will not search the record for post hoc rationalizations to support trial court orders.

We also note that, in any event, there is no indication in the record that the appellee was prejudiced in any way by his codefendants' explanations for their presence and activities at the Riverway Terminal.

feels some other result would be more reasonable. *Simms*, 508 F.Supp. at 1202. The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand. *Indelicato*, 611 F.2d at 387; *United States v. Sinclair*, 438 F.2d 50, 51 n. 1 (5th Cir.1971) (quoting Wright, Miller & Cooper, Federal Practice and Procedure: Criminal § 553, at 487). Motions for new trials based on weight of the evidence are not favored. Courts are to grant them sparingly and with caution, doing so only in those really "exceptional cases." *Lincoln*, 630 F.2d at 1319; *Indelicato*, 611 F.2d at 387; *Simms*, 508 F.Supp. at 1202.

Applying these principles, courts have granted new trial motions based on weight of the evidence only where the credibility of the government's witnesses had been impeached and the government's case had been marked by uncertainties and discrepancies. Thus, for example, in *United States v. Simms*, 508 F.Supp. at 1204–08, the court granted a new trial, explaining there was no direct proof of the defendant's guilt and that "[t]he government's case depends upon inferences upon inferences drawn from uncorroborated testimony that ... is subject to questions of credibility." In *United States v. Hurley*, 281 F.Supp. 443, 449 (D.Conn.1968), the court granted the new trial stating,

> If these factual issues were joined before the jury as matters of clear-cut conflicts in testimony, the jury's decision would remain inviolate. But such was not the case. The direct testimony of Rutt and MacFarlane [the government's key witnesses] was subject to serious impeachment by prior inconsistent statements and by independent evidence.

While many circuits have taken the position that new trials may be ordered on the ground that the verdict is contrary to the weight of the evidence, our circuit apparently has never considered the matter. The government urges us to adopt the view that a new trial motion may never be granted on this ground. We need not decide the issue here, since we are convinced that the jury's verdict in this case was not contrary to the weight of the evidence, and thus that the district court should not, in any event, have granted a new trial on this ground.

The government's case against Suarez-O'Neill was not marked by uncertainties and discrepancies. It was not based on compound inferences. It was not presented through the testimony of impeached and suspect witnesses. The government's case against Suarez-O'Neill was solid and consistent.

Both sides agree that the case against Suarez-O'Neill hinged on whether the government could prove that he knew cocaine was on board the MAR AZUL. To establish this knowledge, the government relied, in part, on the undisputed fact that Suarez-O'Neill was the captain of the MAR AZUL, on board which 454 lbs. of cocaine were found. The suggestion was that it would be very unlikely for the captain, who was in charge of all the workings of the ship, to travel on board the MAR AZUL from Colombia to Miami, with crewmembers involved in the drug conspiracy, and not know that much cocaine was on board. *Cf. United States v. Alfrey*, 620 F.2d 551, 556 (5th Cir.), *cert. denied*, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980) ("the probable length of the voyage, ... the large quantity of marijuana on board, ... and the necessarily close relationship between the captain of the trawler and his two man crew were factors upon which the jury could reasonably find guilt beyond a reasonable doubt").

To establish knowledge, the government also relied on Agent Burns' testimony about Suarez-O'Neill's statement regarding the holding tanks. Even the district court characterized the significance of the statement as "an absolute admission that he knew where the cocaine was in the ship," and as "a confession." Trial Record, vol. 6, at 637. Agent Burns never waivered in his version of his conversation with Suarez-O'Neill. Nor was he ever impeached, or his credibility in any way put into question.

Of course, appellee offered evidence that contradicted the government's evidence, providing, for example, a different version of his conversation with Agent Burns. However, this was a matter of clear-cut conflict in testimony. It was not an instance where the government's case was presented by impeached witnesses, while the testimony of the defendants' witnesses was unwaivering and corroborated by independent evidence.

Under the circumstances of this case, there was no reason for the court to overturn the credibility choice made by the jury. *Cf. Hurley,* 281 F.Supp. at 449 ("If these factual issues were joined before the jury as matters of clear-cut conflicts in testimony, the jury's decision would remain inviolate"). This was simply not one of those "exceptional cases" in which the court had the power to interfere with the jury's factual findings. For the court to have done so here was a clear and manifest abuse of discretion.

### b. *Discovery Violation*

The government's failure to provide the defendant with Agent Burns' question prior to trial was not a proper ground for ordering a new trial. To order the new trial for this reason also would be an abuse of discretion.

In the first place, the government's failure to provide Agent Burns' question was not a discovery violation. The local discovery order required the government to supply the defendant with "[t]he substance of any oral statement made by the defendant before or after his arrest in response to interrogation by a then known to be government agent which the government intends to offer in evidence at trial." Record, vol. 1, at 26. The government supplied precisely that. Indeed, all the parties agree that Suarez-O'Neill's statement about the holding tanks, made in response to Agent Burns' question, was reported promptly to the defendant and his counsel. The appellee's contention was only that the government did not explain the context in which he made the statement. Yet, prior to the time the government undertook to introduce the statement, Suarez-O'Neill never asked for any clarification of his alleged statement, even though it referred to the holding tanks, where, as defense counsel surely knew, cocaine had been found. Presumably, had the defendant been puzzled by the government's disclosure of the statement, he could have sought information as to the circumstances under which it was said to be made. The district court then could have resolved the matter in advance of trial. Instead, the defendant, having been furnished with full and complete disclosure of every word he was said to have spoken, expressed no discontent.

█ When appellee's complaint about disclosure is clearly seen, absent his characterizations, it comes down to nothing more than that the defendant and his counsel failed to appreciate the significance of what had been obtained through discovery. The motion for new trial did not therefore complain of any violation of the discovery order. It complained that when the government discovered it did not also rehearse for the defendant the argument the prosecutor would make to the jury as to the significance of the statement. The government is under no obligation to do so.

█ We are not saying that the prosecution never has to disclose an agent's question in the first instance to satisfy the discovery order. If, for example, the defendant's oral statement was "yes" or "no," the government must provide the question or in some way give meaning to the answer. The defendant could not be expected to know the "substance" of his statement, even though it allegedly came from his own mouth. If, on the other hand, the defendant's oral statement is "I live at 210 Maple Lane," it is hardly necessary to inform the defendant that the question asked was "where do you live." Where the defendant's answer falls somewhere in the middle of these two extreme examples and the defendant is not satisfied with the bare discovery of the words of a statement he is said to have made, we commend to the court and counsel inquiry

into whether the context or circumstances surrounding the statement should be disclosed, leading in many cases to disclosure.[16]

In short, this was not a case in which the prosecutor has carelessly or by design hidden from discovery a statement of the defendant only to spring it in the middle of a trial.[17] We condemn that sort of tactic. Here, the government responded fully to the discovery order and was never asked to expand its response by stating anything about the question to which the statement was a response. The government's action here was not a discovery violation and does not justify the exercise of discretion in favor of a new trial.

Still another reason why the new trial order could not be properly grounded on the government's failure to provide the defendant with Agent Burns' question prior to trial is that the defendant was not prejudiced by it. Appellee's counsel was made aware of Agent Burns' question an entire weekend and one workday prior to the beginning of the defense's case. Defense counsel thus had time to confer with and advise his client about the effect of the question on defense strategy. Indeed, the

defendant testified and denied Agent Burns' version of their conversation. He also presented an expert in naval architecture to testify about the function of the holding tanks. Suarez-O'Neill made no assertion in his motion for new trial that there was something else he could or would have done at the trial had he been appraised of the question prior to trial,[18] nor did he claim that he would present his defense any differently at a new trial.[19]

As stated, this is not a case where the government failed to obey a discovery order. We are not willing to say that there can never be a case where, even without wrongdoing, circumstances are such that the trial was, nevertheless, fundamentally unfair. But this is, obviously, not such a case.

For these reasons, we hold that the new trial motion was erroneously granted. We thus reverse the judgment of acquittal and remand the case to the district court for reinstatement of the original jury verdict of guilty.

## III. CONCLUSION

For the foregoing reasons, the convictions of appellants Juan Martinez, Jaime B.

---

**16.** Of course, if a statement has been fully and fairly disclosed, it would be up to the defendant to move for and demonstrate the need for context and circumstances.

**17.** Appellee's repeated allegations of prosecutorial misconduct and bad faith, made both before the district court and this court, are not supported by the record.

**18.** When counsel for appellee Suarez-O'Neill initially moved to suppress his client's statement, he did make the following comments in response to the court's question as to "what [he] could ... have done to cross-examine that fellow [Burns] if [he] ... had known about it [Burn's question] a month before trial as distinguished from during trial":

Well, I would have cross-examined a number of witnesses differently with regard to this statement.

There were other persons who were present who testified prior to Mr. Burns' testimony. I did not pursue that area, did not really understand it total, the nature of its impact. I thought it was more devastating when I first heard it, due to the fact that it was not known

to me, concealed from me, and I did not know how to handle it when I first heard it, and I thought it was more devastating than it actually turned out to be.

I would have cross examined Agent Burns to determine who else was present during the period of time when that was stated.

I would have attempted to locate some of the witnesses who may be in Colombia who might have been in a position to have heard that statement and could have challenged that statement based upon not only the defendant, the Government's witnesses testified, but would have supplied perhaps other witnesses who were not called by the Government, either Government agents who were present or some of the arrestees who were present.

Supp. Record, vol. 1, at 24–25.

We find no reason why Suarez-O'Neill's counsel could not have done these things during the trial once he learned of Burns' question. Indeed, he did recall Burns as a defense witness. If more time were needed for further investigation, he could have requested a continuance, which he did not do.

**19.** Indeed, we note that the defense did nothing differently on retrial. *See supra* note 2.

Salcedo and Buenaventura Martinez are AFFIRMED. The judgment acquitting Suarez-O'Neill is REVERSED, and the case is REMANDED for reinstatement of the original jury verdict finding Suarez-O'Neill guilty.