**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Clarence Deneal DONALDSON,**
**Defendant–Appellee.**

**No. 01–2036.**

United States Court of Appeals,
Sixth Circuit.

Dec. 6, 2002.

Before BOGGS, SUHRHEINRICH and CLAY, Circuit Judges.

I.

PER CURIAM.

On June 22, 2001, a jury returned a guilty verdict against Defendant Clarence Deneal Donaldson on charges of armed bank robbery of Citizens Bank in Saginaw, Michigan on December 5, 2000, in violation of 18 U.S.C. § 2113(d). The district court, however, granted Defendant's Rule 29 motion for acquittal. The United States appeals the judgment of acquittal. We RE-VERSE.

II.

The Government introduced the following evidence at trial. Shortly before 1:00 p.m., on December 5, 2000, an African–American male entered the Gratiot Road branch of the Citizens Bank in Saginaw, Michigan, and approached the teller window of Dawn Perez. Perez was sorting and counting money in her second drawer at the time.[1] Perez stated that she organized money from small bills to large bills, that each denomination is strapped, and that the money is always kept in order. Perez also stated that although the bank does not normally deal with $2 bills, she

---

1. Perez testified that tellers have two drawers. The top drawer contains loose money that the tellers work with, and the bottom or second drawer contains excess money.

had some on hand in her second drawer on December 5.

Perez stated that the man wore dark clothing, and had an orange mask over his face. He was wearing a hat and gloves. Perez testified that the man threw a duffel bag at her and jumped over the counter. The robber began helping himself to the currency in Perez's second drawer. She took a step toward him, and he turned his knife toward her and said "get back or I will cut you." Perez stepped back as far as she could and put her hands in the air. The robber continued to fill the bag, then jumped back over the counter and left. He escaped with $8,553 in U.S. currency, including the $2 bills. None of the currency was "bait" money.

The only other teller on duty at the time was JoAnne Glaser. She was seated at a desk in the lobby, assisting bank customer Nancy Koepke. Glaser was on the telephone when she noticed a "commotion" to her right at Perez's teller window. Glaser testified that she saw a man "on top of the counter going over the counter," and then grabbing money and putting it into a bag. She stood up, exclaimed "Oh, my God, we're being robbed;" and put the phone by her side. As she continued to watch, Glaser saw the robber turn towards Perez, and then saw Perez back up, and put her hands up. Glaser said that Perez had a "very pale blank scared look on her face." Glaser testified that when the robber had finished, he came back over the counter. Glaser had another client in the safety deposit box room walk out at this moment. Glaser turned toward the woman to tell her to stop. When Glaser turned back, the robber was gone. Glaser stated that she had seen a blade in the man's hand and observed that he was a black male of average height, wearing gloves, black clothing, and an orange muffler.

Nancy Koepke, the customer Glaser had been assisting at her desk, also testified. She stated that there was some commotion, and that when she turned, she saw a person jumping over the counter. Koepke also saw the robber going through the money drawer. Koepke got up, walked around a corner into an empty office, and hid under a desk until the robbery was over. She noticed that the robber wore dark clothing, including on his head. She did not recall seeing a duffel bag or a knife.

After the robber left, Perez locked the bank door and hit the panic alarm. Glaser hung up the phone and called 911. A police cruiser arrived within two minutes. The 911 dispatcher told Glaser that the police had already received another call with a description matching the one she had given.

Frank Ortega, the man who made that call, testified. Ortega's residence at 1010 S. Granger is two blocks from the Citizens Bank on Gratiot. Ortega was home with his two-year old daughter, talking on the telephone at about 1:00 p.m. on December 5, 2000, when he saw a black male walk by the front of his house on Granger in the direction of the bank. Granger stated that the man was wearing dark clothing, a hood with a hat on underneath, an orange mask, and boots, and he was carrying a green bag. Ortega said he appeared to be over six feet tall and thin.

A few minutes later, still on the phone with his friend, Ortega saw the same man walking swiftly by his house in the opposite direction. Ortega grabbed his daughter and put her in a room and picked up his shotgun. He then went to his back door and observed that the man, still carrying a bag had cut through his driveway. Ortega saw the man jump the fence in his neighbor's back yard. Ortega put his friend on hold and called 911. Ortega stated that the police arrived within 90 seconds.

Detectives Garabelli and Yancer, with the Saginaw County Sheriff's Office, were roughly three blocks away from the bank when they were dispatched to Ortega's address. They arrived within several minutes. Garabelli testified that there was fresh snow, so the officers were able to follow a single set of footprints that proceeded up the driveway in an easterly direction from the front of Ortega's house into a back yard. Garabelli stated that he and Yancer followed the footprints to a chicken wire fence that was partially down, and over the fence across the adjoining back yard toward a garage. The officers kept six to eight feet to the side of the foot trail to avoid contamination. The trail led to the side door of an unattached garage located toward the rear of the residential property, 1009 S. Webster, which was Defendant's house. The garage door was open. Garabelli testified that he opened the exterior back door and saw another fresh footprint on the threshold leading into the house. The interior door was locked, however, and the house was dark. Garabelli listened for activity in the house, but did not hear or see anything. Garabelli stated that he saw another set of tracks that led from the rear door to the area in front of Ortega's house. Yancer and Garabelli followed these tracks and met up with a Saginaw City police officer and dog handler Joaquin Guerrero.

Officer Guerrero is a canine handler for the Saginaw City Police Department. Guerrero testified that he was off duty and at home at 1:00 p.m. when he received a call requesting that he proceed to the Citizens Bank on December 5, 2000. He arrived at the bank within five to ten minutes. At the bank parking lot, Guerrero's dog Rookie began tracking. The dog led Guerrero south from the bank on Granger in the direction of Ortega's house. Guerrero testified that he met up with Garabelli and Yancer near Ortega's residence, and that they pointed out a single

set of fresh footprints leading between the Ortega and Marcoux homes.

Garabelli explained that Rookie followed the single set of footprints between the houses and over a short fence. The tracks continued on the other side of the fence through a backyard toward the driveway of 1009 S. Webster, Defendant's residence. Guerrero testified that Defendant was standing in the driveway holding a shovel. Guerrero asked Defendant if anybody had come through the area or left the house. Defendant said no. Guerrero then noticed another set of foot tracks that led away from the back door of 1009 S. Webster. Guerrero and Rookie followed those tracks south to Saginaw Street, up to Bullock, back up to Granger, and then back to the bank, where the trail became too contaminated to follow.

Pamela Marcoux, Ortega's next door neighbor, also testified. She was home baking cookies with a friend on December 5, 2000, around 1:00 p.m., when she saw a man walking up the road. Marcoux testified that "the first thing" she noticed was that the man was wearing an orange ski mask. Marcoux thought it was "weird" because it was not a bitter cold day. Marcoux noted that the man was also wearing either a hat or hood, and was walking in the direction of the bank. A few minutes later, Marcoux saw him walk back the other way. Then, a few minutes after that, Marcoux saw him come back toward the bank again, which Marcoux thought was suspicious. Marcoux said he was carrying a bag, although she did not know what kind. Marcoux and her friend went to the front of the house. Police cars were already there. She opened the door and asked the police if they were looking for the man in the orange mask. They said yes, and Marcoux pointed in the direction of the bank, because they had seen the man walking in that direction.

FBI Agent Robert Lucas testified that he was working in Saginaw on December 5, 2000, when he heard the central dispatch radio traffic concerning the robbery. He arrived at the bank withing five minutes. He interviewed witnesses, viewed the surveillance film and obtained still photographs from the bank surveillance camera. The next morning, December 6, 2000, Lucas and Detective Robert Ruth of the Saginaw PD, visited Defendant at his home. Their initial discussion took place in Defendant's kitchen. Defendant was not under arrest. Lucas testified that while they were seated at the kitchen table, Defendant tried to push a hat off the table. Lucas did a "double take" and looked at the hat, which resembled one in the bank surveillance photos. Lucas asked Defendant if the hat was his and Defendant said that it was.

One of the first questions the officers asked Defendant was whether he had any large sums of money in his house. In response, Defendant pulled $1,292 from his pants pocket. Lucas then asked Defendant several times if there were any other large sums of money in the house, and he said no. Defendant gave them permission to search the house and signed a consent-to-search form.

Lucas found a pair of CAT work boots in the basement and took them outside to Defendant's back yard. The footprint trail from the prior day remained frozen and intact. Lucas took one of the boots and placed it in the footprint. It matched in terms of length, width, and angle, and had the same general type pattern of CAT boots. However, Lucas also testified that these boots, which had no shoelaces and were covered in paint, were not the same boots worn by the robber. The State Crime Lab Report, which was admitted at trial, indicated that the tread design from the CAT boots "was dissimilar to the partial footwear impressions on the latent lifts [from the crime scene]." On the other hand, at one point Defendant himself admitted that he wore a size 10 workboot, and the workboot seized from Defendant's home and sent to the lab was a size 10.

Lucas returned to the basement. Defendant went outside and had a cigarette. When Defendant joined Lucas in the basement. Lucas told Defendant that he believed Defendant was responsible for the bank robbery. Defendant continued to deny any knowledge of the robbery. They went back upstairs for more questioning. Defendant repeated that there were no other large sums of money in the house. Shortly thereafter, Lucas went back into the basement, where he noted a very distinct smell of cigarette odor. Lucas testified that he found this odd, because he had just been downstairs and had not smelled anything unusual. He searched through a pile of clothing on the floor, and found the green jacket that had previously been upstairs on a kitchen chair. Lucas stated that he picked it up, and found $5,100 in the jacket pocket. The money was inside a ziplock baggie, and all of the bills were face up, with 50s, 20s, and 10s arranged in series of like denominations. There were no $2 bills, however, and the money was not strapped. Lucas stated that he also found a kitchen knife in the top drawer of a small dresser in the basement under some clothing. He also located several gym bags, one of which was green.

Lucas proceeded to the garage. He found an orange muffler in the trunk of Defendant's car. In a trash can, Defendant discovered a dishonor notice from the Soaring Eagle Casino in Mt. Pleasant, Michigan, disclosing that two $250 checks Defendant had issued to the casino had been returned for insufficient funds in October. Lucas further retrieved a withdrawal slip dated December 4, 2000, 3:57 p.m., indicating that Defendant had made

a $35 withdrawal from his credit union savings account, leaving a balance of only $3.47. In addition, Lucas seized a number of $2 Michigan lottery tickets from the house and the trash.

Lucas testified that he next asked Defendant where he had obtained the money. Defendant replied that he got the money "from other sources." Lucas arrested Defendant shortly thereafter. Lucas also asked Defendant's wife if the money was hers or if she knew it was in the house. She responded no to both questions and began to cry.

Ruth and Lucas took Defendant to the Saginaw Police Department where he was advised of and waived his *Miranda* rights. He agreed to a further interview, which was tape-recorded. The tape recording was later played to the jury. In his recorded statement, Defendant indicated that he had obtained the $6392 from gambling and "other places," and that he was planning on filing for bankruptcy. When asked why he repeatedly denied that there were any other large sums of money in his house, Defendant said that if he had produced the $5,100, it would not have looked good for him. He also stated that he did not want to explain himself in front of his wife because he "d[idn't] need her involved in you know." Defendant also told Ruth and Lucas that he had withdrawn his last $35 in the credit union account in order to go to the casino. When Ruth pointed out that it didn't make sense to withdraw $35 to gamble when he already had over $5000 at home, Defendant said "I needed to do that so that, I needed to do that, I just needed to do that."

The defense presented several witnesses, including Defendant's son Clarence and his wife. Clarence, who slept downstairs in the area where Lucas found the knife, testified that back in December he was home alone and became scared because he thought he heard something moving in the house. He got a knife. Clarence stated that after he realized that the noise was just the water heater, he put the knife in the dresser under his clothes.

Defendant's wife, Diane, testified that her husband is 5'11." She stated that he gambles frequently and buys lottery tickets. She also stated that Defendant would come home with money from unknown sources. She testified that they were on the verge of bankruptcy and had closed their account at the credit union because of a garnishment.

In closing, the defense emphasized the discrepancies in the amount stolen from the bank and amount found in Defendant's home. Defendant also pointed out that no $2 bills were found on Defendant. Defendant noted that the $2 lottery tickets were not dated, that Mrs. Donaldson testified that her husband always bought lottery tickets. Defendant criticized the Government for not fingerprinting the currency.

The jury found Defendant guilty as charged. The district court granted Defendant's Rule 29 motion for judgment of acquittal, however. The district court detailed its reasoning on the record. First, it faulted the Government for not attempting to determine if Defendant's fingerprints were on the knife. Next, the court criticized the Government's police work regarding the $2 bills:

> In addition, the testimony of Mrs. Donaldson emphasized the poor police work and trying to determine what happened to those $2.00 bills. The rarity of seeing business transacted with $2.00 bills would at least cause the ordinary, prudent investigator to circulate to all lottery ticket sellers a memo or message, which I am sure could be done either by the police officers going to the lottery sellers and asking, or I would think that given the communication message are transmitte[d] to each lottery

seller as to the winning numbers and alike, that system could have been used, or inquiry could have been made if it could be used.

The district court discounted as "neutral at best for the government's case" the distance of the bank from Defendant's house, and noted that the orange muffler had an original plastic hook on it, which was consistent with it not having been used.

The district court also criticized the Government for asserting that the work boots were the exact match to the print in the snow that was recently deposited at the scene, and then later failing to present those same boots to the state police lab. The court completely discounted the Government's evidence that Defendant was home alone. Although it found that the evidence of the hat "presented some weight," the court did not think it "singularly or collectively" supported a verdict beyond a reasonable doubt.

The court also discredited the Government's evidence of Defendant's deception concerning the source of the money:

In terms of the December 6th interview and being deceptive about where the money came from, that ignores the major thrust of that interview, which was a consistent denial of involvement, as well as—and now I am relying only on the admissible part of the tape, as well as the admission of the money coming from illegal sources, and where a person makes that sort of admission at the same time denying the bank robbery—that is not consistent with guilt beyond a reasonable doubt.

The district court then faulted the Government's evidence pertaining to Defendant's alleged gambling earnings, stating that the Government should have checked casino records. The court also discredited the Government's evidence of the bank withdrawal.

The district court was troubled by the Government's evidence concerning Defendant's desire to conceal information from his wife: "Concealment from his wife did not add to the level of proof presented by the government, both because it is an enormous jump logically, and in addition, Mrs. Donaldson testified that he often concealed money from her, which is consistent with his gambling and other problems." The district court also found the Government's evidence concerning the lottery tickets weak: "The other point of reasonable doubt that I noted throughout the absence of showing is when the lottery tickets were bought.... No effort was made that they were current tickets. They may have been, but there is no evidence of that." As another example of faulty police investigation, the court noted that the currency taken from Defendant's house was not fingerprinted. The court then questioned the credibility of the officers in charge:

Further, there are credibility questions here, and I think the credibility of the officers in charge was consistent with his conclusion, that by following the footsteps and finding the knife in the basement, and having a person who was on the verge of filing bankruptcy, which was not a disputed fact, led to a lot of this carelessness, and carelessness is exactly the right word.

The appearance from the bench was that the officer could care less to testify that he forgot that there was a couch in a small basement room where the knife was found, not to say that the size of the clothes, underwear and socks found in the drawer where the knife was found. Those are the obvious weaknesses of the case.

Finally, the court noted that the blue bag that was admitted into evidence, was thought by some witnesses to be green. The court concluded:

[T]his case was not an overwhelming case. I don't have a clue, Mr. Donaldson, whether you did the bank robbery or not, but I have a very strong feeling you were not convicted based on proof beyond a reasonable doubt, and therefore, the Rule 29(A) and (C) motion—or motions are granted.

The Government appeals.

## II.

The Government argues that, in granting Defendant's motion for judgment of acquittal, the trial court failed to consider the evidence in the light most favorable to the Government and improperly substituted its own judgment for that of the trier of fact. The Government continues that, when the record is viewed in its entirety and under the proper standard, it is clear that there was ample evidence to support the jury's verdict.

Rule 29(c) of the Federal Rules of Criminal Procedure allows a trial court to set aside a jury verdict and enter judgment of acquittal when "after viewing the evidence in the light most favorable to the prosecution," the trial court finds that no rational trier of fact "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In reviewing a district court's order of acquittal, we apply the same standard to the record before us, assuming "the truth of the evidence offered by the prosecution." *United States v. Connery*, 867 F.2d 929, 930 (6th Cir.1989) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir.1985)). The granting of a motion for judgment of acquittal, "will be confined to cases where the prosecution's failure is clear." *Id.* (quoting *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).

In addition to considering the evidence and inferences in the light most favorable to the government, the court must refrain from independently judging the credibility of witnesses or weight of the evidence. *United States v. Welch*, 97 F.3d 142, 148 (6th Cir.1996) (citing *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781). Circumstantial evidence may sustain a conviction so long as the totality of the evidence was substantial enough to establish guilt beyond a reasonable doubt. *United States v. Phibbs*, 999 F.2d 1053, 1064 (6th Cir.1993).

The Government asserts that the district court neither articulated nor applied the proper standard for adjudicating a Rule 29 motion, and that, instead, "[i]ts analysis consisted almost entirely of after-the-fact criticisms of the investigation, reciting a number of perceived 'omissions and errors' on the part of the investigators." Gov't Br. at 19. The Government states that the court substituted its own judgment for that of a jury which deliberated approximately five hours before rendering a verdict.

We agree with the Government that the evidence adduced at trial was more than sufficient to support the verdict. First, footprints in freshly fallen snow led directly from the bank, down the driveway between the Marcoux and Ortega homes, over a fence and through another yard right to Defendant's open garage. These footprints were not only clearly visible to the naked eye, but were corroborated by a trained police dog. Fresh footprints on the day of the robbery also led from the garage to Defendant's back door, which, when opened, revealed a fresh snowy footprint on the threshold leading into the house. Defendant's back door is 903 feet from the entrance to the bank.

Defendant's house appeared dark only minutes after the robbery, although Defendant later said that he was home at the time. Another set of footprints led from the back door in the opposite direction,

describing a short circular route returning to the point where the perpetrator had fled down the Marcoux–Ortega driveway and over the back fence. Although the district court was dismissive of this evidence, stating that the police jumped to conclusions because "[t]hey had footprints to a house and found a lot of money," we think that from this evidence, a rational trier of fact could conclude that Defendant was the perpetrator. That is, a rational juror could conclude that the person whose fresh footprints led directly to his own yard, only 903 feet from the bank, and into the house where he was found, was the robber. Further, we think a rational juror could conclude that it was more likely that Defendant was the perpetrator than if he had been several miles away, and not in his home, where he had time to change, hide the orange muffler in the trunk of his car, and hide the stolen money.

The district court also discredited evidence of the work boots found in Defendant's basement, which fit the length and width of one of the snowy footprints. In this regard it appears that the district court got Agent Lucas's testimony wrong. Lucas did not state that the boots found in the basement were the actual boots worn by the robber. In fact, he explained that they could not be the perpetrator's boots because they had no shoelaces and had not been worn recently. But there is no reason to doubt the evidence that the boot print on the bank counter and the snowy footprints in Defendant's back yard were made by boots of the same make, and that the boots found in Defendant's house were the same size Defendant wears and of the same width and general pattern as the boots worn by the escaping bank robber.

Several items found in or near Defendant's residence also contributed to identifying him as the robber, and the district court's efforts to undermine other evidence was improper. Early during the interview on December 6, Lucas noticed Defendant trying to conceal a black leather-like cap that matched the description of the one worn by the robber. As the court acknowledged, this evidence was entitled to "some weight."

Lucas also testified about the orange muffler he found buried in the trunk of Defendant's car. This piece of evidence was quite significant because most of the witnesses described the robber as wearing a distinctive orange muffler or mask. Moreover, the trail Garabelli followed from the bank went directly into the garage and then directly to the back door, suggesting that Defendant had removed the orange muffler and hid it in the trunk of his car before going into his house after the robbery. The district court gave this evidence no weight because the muffler had an "original plastic hook," which to the court apparently meant that it was newly purchased after the robbery or not used. This inference ignores Lucas's testimony that the muffler had been worn, and also the fact that the plastic hook could have been concealed under the hat. More importantly, it does not undermine the significance of the fact that an orange muffler was found in Defendant's car.

Lucas also found $5,100 in cash hidden in Defendant's coat. The money was arranged in the same way Perez counted and sorted money at the bank. It is also not inconsequential that Defendant made efforts to hide it, since one can infer that the cash had been taken from the bank. In sum, the following evidence, viewed collectively, allowed a rational juror to conclude beyond a reasonable doubt that Defendant was the bank robber: (1) the footprints, (2) Defendant's presence at home, (3) the short distance between Defendant's home and the bank, (4) the orange muffler, (5) the black leather-like hat which Defendant attempted to conceal from the officers, (6) Defendant's possession of such a large sum

of cash when he otherwise appeared to be on the verge of bankruptcy, (7) Defendant's evasiveness, (8) the knife found under clothing in the basement dresser, and (9) the other evidence, including Defendant's taped statement. The district court decided to draw different inferences from these facts, both individually and collectively, as well as relying on alleged investigative failures. However, because there was sufficient evidence to support the jury's verdict, the district court erred in substituting its judgment for that of the jurors.

The district court also discounted the Government's evidence of Defendant's finances and false exculpatory statements. The Government introduced evidence that Defendant was home on the day of the robbery because he was unemployed. In his taped statement, Defendant stated that he was heavily in debt with medical bills and household expenses. The Government showed that on December 4, the day before the robbery, Defendant withdrew $35 from his credit union account, leaving a balance of only $3.47. Coupled with Defendant's admitted gambling problem, we think it eminently reasonable for a jury to infer that Defendant needed the last $35 he had to go gambling the night before the robbery, and that on the morning of December 5, 2000, he was totally broke.

This inference is further strengthened by Defendant's evasive explanation of the source of the money. He told the investigators that he had obtained the $1,292 from gambling and other undisclosed sources and that he had been accumulating this money and the $5,100 for over a month. However, the jury could have easily concluded that he did not have this money until December 5, because he withdrew $35 and virtually emptied his bank account the day before to go gambling. In other words, the jury could rationally find Defendant's account not credible.

Although $8,553 was taken from the bank and only $6,393 was found in Defendant's home, Defendant's wife testified that he did not come home until 5:00 a.m. on the morning following the robbery. From this the jury could easily infer that Defendant had gone gambling with his newly-acquired funds. Defendant emphasized the absence of $2 bills from the money in his home. Again, the jury was entitled to infer that Defendant used those bills to gamble, either at the casino or on lottery tickets, after the robbery.

Defendant's credibility was further diminished by his allusion to other undefined unlawful activities as the source of the cash. The district court found that Defendant's willingness to admit to unlawful activity while denying that he committed the bank robbery created a reasonable doubt. As the Government points out, the district court seemed to be judging these statements as if they were admissions against penal interest under Fed.R.Evid. 804(b)(3), according them a presumption of reliability, and then as somehow bolstering his denial as to the bank robbery. But Defendant was not really incriminating himself with his vague references to illegal activity. Rather, a jury could reasonably infer that Defendant's explanation was less risky than the truth and that Defendant was simply trying to mislead the investigators. In any event, the jury heard the taped interview of Defendant, and made its own credibility determination. The district court made a different credibility determination. However, the district court was not the proper fact finder here.

The district court found more reasonable doubt in the fact that although Defendant is 5'11", both Perez and Glaser estimated his height at 5'7". Specifically, the court found that "the height of the perpetrator as identified by the two trained bank tellers who are trained to note, that does raise a reasonable doubt." However,

the district court failed to take into account the fact that the robber was in constant motion, so that the tellers probably never saw him standing straight and still. Further, both were taken by surprise. As we have previously observed, "[t]here is a great potential for misidentification when a witness identifies a stranger based solely upon a single brief observation, and this risk is increased when the observation was made at a time of stress or excitement." *United States v. Russell*, 532 F.2d 1063, 1066 (6th Cir.1976). Moreover, the district court ignored Ortega's testimony that the masked man was six feet tall.

The district court also faulted the Government for not attempting to obtain and match fingerprints that may have been on the kitchen knife found in the basement. However, the district court overlooked the fact that the robber wore gloves. Further, Defendant's prints would probably have been on the knife anyway, so prints would not be probative of anything.

In sum, the district court erred in isolating pieces of testimony, finding fault in the Government's conduct of the investigation, focusing on investigative steps that should have been taken but were not, making negative credibility determinations about the Government's witnesses, refusing to draw very reasonable inferences in favor of the Government, and otherwise substituting its view of the evidence for that of the jury. Viewing all the evidence in the light most favorable to the prosecution, the jury's verdict was supported by the evidence beyond a reasonable doubt.

### III.

For the reasons stated above, the judgment of the district court is REVERSED and the jury verdict REINSTATED.