[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 23, 2011
JOHN LEY
CLERK

_____

No. 10-13544

_____

D.C. Docket No. 2:09-cr-00081-MEF-SRW-1

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

DANIEL LAMAR HATCHER,
a.k.a. Doo-Doo,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(September 23, 2011)

Before CARNES, ANDERSON and FARRIS,[*] Circuit Judges.

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

PER CURIAM:

After Daniel "Doo-Doo" Hatcher was convicted by a jury of drug charges, the district court granted his motion for a new trial in "the interest of justice." See Fed. R. Crim. P. 33. The court did so based on its conclusion that there had been such "a lack of communication" resulting from a "highly strained relationship" between Hatcher and one of his attorneys that "a proper defense was not possible under such circumstances." This is the government's appeal from the order granting a new trial. For reasons we will explain, we must vacate the district court's order and remand for further findings and explanation before we can decide whether the grant of a new trial in the circumstances of this case is an abuse of discretion.

I.

The facts established by the evidence at trial, viewed in the light most favorable to the guilty verdict, are as follows. On October 27, 2008, Clifford Ellis, a paid confidential informant working for the Montgomery police department, attempted to make a controlled buy of narcotics at a Montgomery, Alabama housing project from a target named "Little G." Ellis asked Little G to sell him some powder or crack cocaine, but Little G did not have any in stock. A few others who were hanging around the housing project told Ellis that "Doo-Doo,"

2

who was later identified as Daniel Hatcher, had "some fresh," or pure powder cocaine, in stock. Ellis eventually tracked down Hatcher, asked him what he had for sale, and purchased "a personal, $20 worth," of powder cocaine from him.

Before purchasing any more cocaine, Ellis walked out of the housing project to call Officers Bill Hamil and Nikki Cooper. He reported to them about his lack of luck with Little G and how he had stumbled onto Hatcher and bought some cocaine from him instead. Officer Hamil gave Ellis the green light to go back to the housing project and "deal with Doo-Doo again." After that conversation, Ellis walked back to the housing project, tracked down Hatcher, and bought more powder cocaine from him.

All told, Ellis paid Hatcher $60 for at least 0.7 grams of powder cocaine that day.[1] A small camera hidden in a button on Ellis' shirt recorded audio and video footage of the transaction and the events leading up to it. After Ellis had handed over the cash in exchange for the cocaine, Hatcher gave him his phone number and told him to call if he ever wanted to buy "some weight," which Ellis testified meant more drugs in larger quantities.

At the Montgomery Police Department's urging, Ellis took Hatcher up on

---

[1] Ellis' testimony indicated the amount of powder cocaine was more than a gram, but Officer Hamil twice stated on cross-examination that it weighed 0.7 grams.

that offer. On the morning of November 5, 2008, Ellis used the phone number that Hatcher had given to him during the first controlled buy to set up a second one.[2] During the first phone call, Ellis asked Hatcher if he could buy a "split" of crack cocaine from him.[3] Initially, Hatcher told Ellis the crack cocaine would cost $2,300, but during a fourth call between the two of them, Hatcher told Ellis the price had changed to $2,500. After some back and forth about where to do the drug deal, they agreed to meet around 1:00 p.m. in a shopping center parking lot a short distance south of downtown Montgomery. Hatcher told Ellis he would be in a white car.

Before the controlled buy, Officers Hamil and Cooper hid an audio recording device on Ellis while other officers set up around the parking lot for surveillance purposes and in anticipation of making an arrest. The officers gave Ellis $2,300 in cash and a bicycle and dropped him off a few blocks away from the parking lot, leaving Ellis to pedal the rest of the way on the bike. When he got to

---

[2] The audio recording of the first and second call made to Hatcher from Ellis' phone began with Officer Hamil stating "This will be an undercover phone call to [a specific phone number], to Doo-Doo." Ellis testified that the number Hatcher had given him was [a second phone number], which the video of the October 27 drug deal between the two of them confirmed. Ellis also testified that for the November 5 phone calls he had in fact "dialed the number that Doo-Doo gave me"—[that second phone number].

[3] A split is one sixteenth of a kilogram, or 62.5 grams, of crack cocaine. It is referred to as a split because it is half of a "big eight," which is in turn one-eighth of a kilogram.

4

the lot Ellis found Hatcher waiting in the passenger seat of a parked, white four-door sedan.  In the driver's seat was Patrick Delbridge whom Ellis had not met before.  Ellis climbed into the back seat and sat behind Hatcher.

Once inside the car Ellis asked for the crack cocaine, and Hatcher put some on a scale to show Ellis that it weighed 63 grams, and he told Ellis the price was $2,500.  As Hatcher and Delbridge were counting the money, Ellis told Hatcher he had brought only $2,300 with him.  Hatcher kept counting, but Delbridge stopped and put the crack cocaine "back on the scales and started taking it out with his hand because it was 63 grams, and he needed it broke down to 56 grams."  After reducing the amount of crack in the bag down to 56 grams, Delbridge handed Ellis the bag, and Hatcher kept the cash.  Ellis checked its weight on the scale and said "this is it"—the "take-down word" that signaled to the officers lying in wait that the deal had gone down.

The officers who had set up around the parking lot sprang into action, moving in for the arrest.  Officers Drummond and Roberts pulled up in their car next to the driver's side door of the white sedan.  As Drummond "drove up" he saw Delbridge set what appeared to be a piece of crack cocaine on the center console, and he saw Hatcher turn toward him, panic, and fumble for the door. Drummond then pulled Delbridge out of the driver's seat and handcuffed him,

5

while Hatcher got out of the car, threw some money on the ground, and took off running. Officer Roberts ran after Hatcher and chased him through the parking lot, but he could not catch him.

Officers Hamil and Cooper, who had been waiting in their car down the road from the parking lot, drove toward the lot after hearing the signal from Ellis. As they pulled within sight of the parking lot, they caught sight of Hatcher running out of it and then watched as he sprinted past their car with law enforcement officers hot on his heels. Other officers, who had been stationed north of the parking lot, caught up with Hatcher a short distance from the lot and arrested him in the middle of the street.

After the arrest, Officer Drummond confiscated the crack cocaine that Ellis had gotten from Hatcher and Delbridge in the controlled buy. Drummond found part of the money that had been used in the buy in the passenger side floorboard of the white sedan and the rest of it on the parking lot pavement outside of the sedan's passenger side door. He seized the rest of the crack cocaine—at least some part of what Delbridge had pulled out of the bag during the drug deal—from atop the center console of the sedan where Delbridge had set it down when he saw the police approaching. Once back at the police station, Officer Drummond gave the crack cocaine and cash to Officer Cooper. Cooper sealed the crack cocaine in

a marked evidence bag and put it in the evidence locker where it remained until federal officers sent it off for analysis. The test results showed that the net weight of the crack was more than 50 grams. Before the currency used as buy money was given to Ellis earlier that day, photocopies of the bills had been made in order to record the serial numbers. Cooper verified that the serial numbers on the currency recovered from the parking lot "match[ed] up to the copies that had been made" before she had handed the currency to Ellis.

## II.

On May 29, 2009, a grand jury indicted Hatcher and Delbridge for the drug transaction with Ellis that took place in the white sedan on November 5, 2008. The indictment charged them with one count of conspiracy to distribute crack cocaine and one count of distribution of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.[4] In July 2009, the district court appointed the Federal Public Defender to represent Hatcher, and Assistant Federal Public Defender Donnie Bethel was assigned to Hatcher's case. That same month, on July 20, 2009, the government informed Hatcher through counsel that it intended "to use at trial any of [his] prior convictions, crimes, wrongs, or acts, as permitted under

---

[4] The court eventually severed Delbridge's trial from Hatcher's because of questions about Delbridge's competency to stand trial.

7

[Federal Rule of Evidence 404(b)]."

In September 2009, Hatcher filed a pro se motion to remove Bethel and have new counsel appointed to represent him. Hatcher's motion asserted that Bethel had lied about filing motions, had advised him to plead guilty, had misstated Hatcher's criminal history at the pretrial conference, and had failed to file a motion regarding a law enforcement officer's statement made at Hatcher's parole hearing that purportedly would have exonerated him. The motion also accused Bethel of "not being a Defender." After conducting a hearing on that motion the magistrate judge entered an oral order denying it.

Sometime after his appointment and before December 22, 2009, attorney Bethel asked the federal prosecutor for a copy of the audio and video recording of the October 27, 2008 drug transaction between Hatcher and Ellis. That was the first transaction, where Ellis had bought only $60 worth of powder cocaine from Hatcher. Apparently, at the time of Bethel's request, the federal prosecutor had not yet learned from the Montgomery officers of the October 27 drug transaction or of any audio and video recording of it.

On December 22, 2009, the federal prosecutor sent Hatcher, through attorney Bethel, a copy of the October 27, 2008 recording. On March 8, 2010, Bethel's co-counsel, James Lawley, filed a motion in limine to exclude the

8

recording of the October 27 controlled buy for lack of Rule 404(b) notice. That same day, even though it had already informed the defense of its intent to use the audio and video recording, the government filed a precautionary Rule 404(b) notice of intent to use that recording at trial as evidence of Hatcher's prior bad acts. On April 19, 2010, the first day of trial, the district court held a motions hearing before trial began at which it orally denied the motion in limine on the ground that the evidence was not extrinsic, and as a result that evidence was admissible without reference to Rule 404(b).

At trial the government introduced into evidence the audio and video recording of the October 27, 2008 drug deal. The government also played for the jury the audio recordings of the November 5, 2008 phone calls between Ellis and Hatcher, and an audio recording of the controlled buy that took place later that same day and led to Hatcher's arrest. The government put Ellis and Officers Hamil and Cooper on the stand, and they testified to the events surrounding Ellis' initial contact with Hatcher and the powder cocaine transaction between the two of them on October 27. Ellis also testified about his phone conversations with Hatcher leading up to the November 5 controlled buy and about the buy itself. The government called Officer Drummond, who testified about the events surrounding Hatcher's arrest, and it called a DEA lab analyst who testified that the

crack cocaine taken from the crime scene weighed more than 50 grams.

During the course of the trial, several witnesses, including Ellis, positively identified Hatcher as the person on the audio recordings of the November 5, 2008 transaction. Ellis identified him as one of the two men in the white sedan with whom he did the drug transaction that day. Officer Drummond identified Hatcher as the man he saw get out of the white sedan, drop the cash, and run. Officers Hamil and Cooper identified Hatcher as the person they saw run out of the parking lot and pass near their car with other officers in hot pursuit. Ellis also identified Hatcher as the man who sold him drugs in the October 27 video and identified Hatcher's voice as the voice on that video.

As for the defense, co-counsel Lawley used his opening statement to argue that Hatcher was an innocent man who happened to be in the wrong place at the wrong time. He asserted that the government's only witness who could identify Hatcher as the passenger in Delbridge's car was Ellis, and that there were good reasons to question whether Ellis was telling the truth. Specifically, he noted that Ellis was a convicted felon who was still on parole at the time of Hatcher's arrest, that Ellis was paid in cash, and that the government granted Ellis leniency in return for his informant services. Building on a "wrong-place-wrong-time" defense, Lawley told the jury that the government would not be presenting any

10

fingerprint evidence to connect Hatcher to the white sedan, to the bag of crack cocaine, or to the scales used to weigh the crack. He also pointed out the fact that the police "didn't bother" to videotape the drug deal for which Hatcher was arrested.

The lack of both fingerprint and video evidence was thoroughly explored by Bethel and Lawley during their cross-examination of the police officers who took the stand. The two attorneys also attacked Ellis' credibility through cross-examination of the government witnesses. During his cross-examination of Ellis, Lawley pointed out the discrepancy between Hatcher's actual phone number and the one announced by Officer Hamil on the November 5, 2008 audio recording. Finally, Hatcher's counsel attempted to provide a plausible reason why Hatcher had been in the area that day other than to sell crack cocaine. They called the mother of Hatcher's son to testify that on November 5, 2008 she and their son lived in a housing project only a few hundred yards north of the parking lot near which Hatcher was arrested.

After two days of trial and eight hours of deliberation, the jury returned a verdict on April 20, 2010, finding Hatcher guilty on both counts in the indictment. A week after the verdict, Hatcher filed a pro se motion for a new trial on grounds of ineffective assistance of counsel, which focused on the audio and video

11

recording of the October 27, 2008 drug deal. His motion asserted that Bethel had told the government about the recording in retaliation for the pro se pretrial motion Hatcher had filed to have Bethel removed as his counsel. Without waiting on a response from the government, the district court in a May 7, 2010 order applied the test set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984), and denied Hatcher's motion for a new trial. It decided that Hatcher could not show prejudice because of the other unchallenged and overwhelming evidence against him. The court concluded that "the verdict would have been the same absent video of the prior drug purchase."

On May 18, 2010, Hatcher filed a pro se "Motion of Extending Time" under Federal Rule of Criminal Procedure 45(b), requesting additional time to appeal the denial of his motion for a new trial and also renewing his request for new counsel. The district court denied the motion for more time as itself untimely but ordered attorneys Bethel and Lawley to show cause as to why Hatcher should not get new counsel. They responded that both of them had "met with Mr. Hatcher regularly in preparation for trial"; that they had continued to meet with him since the trial; and that they were fully prepared to remain as his counsel through sentencing and direct appeal. After receiving that response, the court scheduled a hearing on Hatcher's motion.

At the hearing, Hatcher, speaking on his own behalf, repeated his argument that Bethel had rendered ineffective assistance because he had "sought vengeance and retaliated by informing [the] United States Government [prosecutor] about [his] prior bad act"—the October 27 drug deal with Ellis. He also argued that Bethel had failed to point out a number of purported discrepancies in, and problems with, the evidence including: 1) some difference between the amount of money collected at the scene of the controlled buy and the photos of the money before it was checked out; 2) whether the officers could actually see Hatcher in the white sedan through not only the sedan's tinted windows but also through Delbridge, the "six one, three hundred something pounds" person in the driver's seat; and 3) some issue with the chain-of-custody testimony about the crack cocaine.[5]

---

[5] At the hearing on his motion, this is what Hatcher said about the purported chain-of-custody issue with the crack cocaine:

> Okay. Also as far as the quantity of the drugs and, you know, the pieces of drug. Nikki Cooper had said there was no chain of custody also. They did not argue for a chain of custody as far as the drugs being given from the informant to Drummond, and then Drummond later on at the precinct gave the drugs over to Nikki Cooper. None of this here, you know what I'm saying, was argued as far as the chain of custody also, Your Honor.

> And also about the substance itself, as far as the crack cocaine base. Nikki Cooper said when she got it, it was in one piece. Now, the confidential informant states on the tape that it's another piece of drugs inside on the console of the car once he gave over the drugs supposed to have been to Sergeant Drummond. None of this was disputed as far as in the trial, Your Honor.

13

According to Hatcher, because they had not properly explored how those discrepancies or problems with the evidence had weakened the government's case against him, his attorneys did not adequately present his defense that he was an innocent man who, as he insisted, just happened to be in the area when police "tackled [him] right there down from where they say this incident occurred." On that basis, he asked the district court to reconsider its order denying his motion for a new trial on ineffective assistance of counsel grounds.

Before ruling on the motion, the court asked attorney Bethel to respond to Hatcher's claim that he and Lawley had rendered ineffective assistance. Bethel did so, explaining that he had asked the prosecutor for a copy of the October 27, 2008 recording after hearing from the government that it intended to introduce all Rule 404(b) evidence of Hatcher's prior bad acts. He assumed the federal prosecutors already knew about the October 27 recording because it was in their possession and it involved the same confidential informant who was involved in the controlled buy for which Hatcher was being prosecuted.

When asked about the evidentiary discrepancies Hatcher had asserted, Bethel stated that he could not respond to those purported discrepancies because he "purposely had Mr. Lawley," his co-counsel, "conduct as much of the trial as possible" due to "some concerns that we had with Mr. Hatcher and his cooperation

14

and his attitude toward my participation in this trial."  Specifically, Bethel stated that Hatcher had not told him about the tinted windows because all that Hatcher had told him—and he told him "repeatedly"—was that "he wasn't there.  He wasn't in the car," which is the same assertion that Hatcher had made to the district court.  Bethel also told the court that he did not know of any discrepancy about the money used for the controlled buy because it was "the first [he had] heard about that."  He made no comment about the chain of custody for the crack cocaine, and the court did not specifically ask him about it.

After hearing Bethel's response and without hearing from the government, the district court orally granted Hatcher's request for a new trial and his request for new counsel.  In doing so, the court concluded that new counsel was needed, explaining to Hatcher himself that it was doing so:

> not because I find that Mr. Bethel or Mr. Lawley did anything that hindered the prosecution of your case or lacked in their defense of you in the least; but I find that any animosity that seems to have developed between you and your defense counsel may have interfered with your ability to effectively communicate with your attorneys.

After the court orally granted the new trial, the government objected and asked for clarification of the ruling.  The government wanted to know whether the grant of a new trial was based on ineffective assistance of counsel grounds, and the court stated:  "It is not."  When the government asked for more clarification, the district

court stated that it found "under the totality of the circumstances, the interest of justice requires that this Court grant Mr. Hatcher a new trial, and I am going to grant his request to have new counsel appointed to represent him."

Five days later, on June 15, 2010, the district court entered a written order vacating the jury verdict and granting Hatcher a new trial. In that written order, the district court reiterated its previous finding that, judged under the Strickland standards, Hatcher's attorneys had not rendered ineffective assistance by asking the government for a copy of the October 27, 2008 audio and video recording. Although the court had earlier addressed only the prejudice component of Hatcher's ineffective assistance claim, in its written order the court not only found that there was no prejudice but also that there had been no deficient performance either. The court rejected Hatcher's argument that Bethel had intentionally clued the government in to the existence of the October 27, 2008 video recording in its possession. Instead, the court found that it was reasonable for Bethel to have assumed that the recording was part of the 404(b) evidence the government planned to introduce at trial because it involved the same informant who was involved in the drug deal that was being prosecuted.

Nonetheless, the court's June 15, 2010 written order granted Hatcher's motion for a new trial on an alternative ground, explaining that:

> Rule 33 of the Federal Rules of Criminal Procedure allows the Court to vacate any judgment and grant a new trial "if the interest of justice so requires." The decision to grant a new trial is within the sound discretion of the trial judge. Looking to the totality of the circumstances, the interests of justice require a new trial in this case. The record before the Court and Hatcher's statements demonstrate a highly strained relationship between Hatcher and his counsel, stretching back well before his trial, resulting in a lack of communication. The Court finds that a proper defense was not possible under such circumstances. See, e.g., [United States] v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997).

(first and second citations omitted). The court did not enter any findings about what culpability, if any, Hatcher had for the strained relationship with his counsel; why any lack of communication made "a proper defense" impossible; why the defense that counsel did put forward—which the court had earlier found was not lacking "in the least"—was not "a proper defense"; what additional defense, if any, could have been put forward if there had been better communication; or whether any failure that resulted from the lack of communication resulted in any prejudice.

This is the government's appeal from the district court's order granting Hatcher a new trial.

### III.

We review a district court's ruling on a motion for a new trial under Federal Rule of Criminal Procedure 33 only for an abuse of discretion. See United States

17

v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006). Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). We have defined the interest-of-justice standard as "a broad standard" that "is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous." United States v. Vicaria, 12 F.3d 195, 198 (11th Cir. 1994). We have also not been "willing to say that there can never be a case where, even without wrongdoing, circumstances are such that the trial was, nevertheless, fundamentally unfair." United States v. Martinez, 763 F.2d 1297, 1315 (11th Cir. 1985). At the same time, we have not been directed to nor have we found any case in which we upheld the grant of a new trial on grounds that there was a breakdown in communication between the defendant and his counsel that did not result in ineffective assistance of counsel.

The district court's ruling in this case is problematic for a number of reasons. For one thing, the court rejected the only ineffective assistance of counsel claim that was put before it, which involved Bethel's request that the government provide him with any audio and video recording it had of the October 27, 2008 drug deal between Hatcher and Ellis. In addition to finding a lack of prejudice from counsel's action, the district court found that it was reasonable for

18

Bethel to assume that the government was aware of that transaction, which was taped, because it involved the same confidential informant buying drugs from Hatcher just nine days before the transaction for which Hatcher was being prosecuted in this case. The unquestionably correct finding that counsel acted reasonably in requesting the audio and video tapes is significant because that request is apparently one of the primary reasons Hatcher became bitter at his counsel, leading to their difficulties in communicating. It cannot be that a defendant can pick a fight with his counsel because of an entirely reasonable action that counsel took, refuse to communicate with counsel as a result, and then win a new trial on the ground that there was a failure to communicate. On remand the district court should inquire into the reasons for the breakdown in communication between Hatcher and Bethel, determine how much Hatcher was at fault, and consider those matters in deciding whether to grant Hatcher a new trial.

The district court also did not explain how what it termed a "lack of communication" made "a proper defense" impossible. Nor did it explain how that finding could be reconciled with its earlier finding that the attorneys had not "lacked in their defense of [Hatcher] in the least." The record indicates that attorneys Bethel and Lawley did, in fact, mount what appears in every respect to be a proper defense. If, on remand the district court continues to believe that the

19

defense put forward at trial was not a proper one, it should explain why.

To the extent that the district court's grant of a new trial is based on the belief that a more effective defense could have been presented if there had been better communication between Hatcher and Ellis, the court should explain the basis for that belief and make a determination of the likelihood, if any, that the resulting defense would have affected the result of the trial. Analogous precedent in this general area indicates that prejudice is at least an important, and perhaps an essential, element of any claim that a conviction should be set aside because of animosity resulting in a breakdown in communication between a defendant and his counsel. See United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997).

At the June 10, 2010 hearing on his motion for new counsel, Hatcher made three assertions about how his lack of communication with his counsel had prevented counsel from putting forth an adequate defense, and he reiterated two of those assertions in this Court.[6] First, he asserted: "[t]hat money, you know what I'm saying, was not the money that [Officer] Cooper had checked out from the precinct." Second, he asserted that Officer Drummond—the driver of the first

---

[6] The third assertion, which Hatcher raised in the district court and only briefly alluded to at oral argument before this Court, was a purported problem with the chain of custody for the crack cocaine seized at the scene of the controlled buy. See supra at 14–15 n.5. Hatcher's brief to this Court, however, did not raise that argument, and so we have no occasion to pass on it. The district court may do so, if it wishes, on remand.

20

vehicle to move in for the arrest and arrive at the white sedan—testified that "he pulled to the driver's side," which was inconsistent with his testimony that he saw Hatcher panic inside the car and reach for the door. Hatcher argued that Drummond could not have seen that because the car windows were tinted and Delbridge, the person in the driver's seat, was a large man.

The district court did not pass on the factual validity of either of those contentions, but there is substantial reason to doubt them.[7] For purposes of this analysis, however, we will assume that both have a factual basis. But even if true, shedding light on those discrepancies at trial would have, at most, called into question only the credibility of Officer Drummond's testimony about what he saw inside the car and Officer Cooper's testimony about whether she had properly accounted for the money used in the controlled buy. Even erasing Drummond's

---

[7] Regarding the money, Hatcher told Ellis during two different phone calls that the crack cocaine would cost $2,300. The photocopies of the money taken by Officer Cooper before handing it over to Ellis add up to $2,300. Officer Drummond testified that he collected $2,300 from the scene of the drug deal and turned it over to Cooper who testified that she matched the serial numbers of that currency with those of the currency she had photocopied before it was given to Ellis for the controlled buy. Based on that testimony, it is difficult to see how counsel could possibly have established any discrepancy in the controlled buy money. On remand, the district court may wish to make a finding about that.

Regarding the obstructions blocking Officer Drummond's vision, Drummond testified that as he drove up he saw Hatcher panic and reach for the door, which is consistent with his testimony that he pulled up alongside the driver's side door to get out and make the arrest. As he was driving toward the white sedan, Drummond's view of the events unfolding inside the car would not have been obstructed by tinted windows or by Delbridge because Drummond would have been looking into the car through its front windshield.

testimony about what he saw inside the car and even assuming that Officer Cooper did not properly account for the buy money, we question whether it could have made any difference in view of the other evidence that overwhelmingly proved Hatcher's guilt.

One video recording showed Hatcher selling powder cocaine to Ellis a week before the controlled buy. Five phone calls between Ellis and Hatcher were recorded on November 5, 2008 setting up the later controlled buy of crack cocaine, which is the crime for which Hatcher was indicted. The November 5 controlled buy itself was audio recorded. Ellis identified Hatcher's voice on the phone call recordings and the recording of the controlled buy. Ellis also identified Hatcher in court as the person who sold him drugs in the car in the parking lot on November 5, 2008. Officer Drummond testified that he saw Hatcher, in broad daylight, get out of the white sedan, drop the cash, and run. Officers Hamil and Cooper testified that they saw Hatcher run out of the parking lot with officers in hot pursuit shortly before Hatcher was subdued and arrested a short distance north of that parking lot. The crack cocaine found in Ellis' possession after the buy weighed more than 50 grams and, after testing, was identified as crack cocaine. Given that evidence, we do not see how any breakdown in communication that prevented the defense from bringing up these two matters could possibly have

22

affected the result or prevented the presentation of a proper defense.  If the district court on remand believes otherwise, it should make the necessary findings and explain the basis for that belief.

We have, of course, carefully considered the decision that the district court cited in support of its ruling granting Hatcher a new trial.  In United States v. Calderon, 127 F.3d 1314 (11th Cir. 1997), after one of the defendants, Rene Gamboa, had been convicted but before he was sentenced, he filed pro se a series of letters asserting that his attorney "was derelict in filing proper motions, biased, inexperienced, and generally unenthusiastic about representing him."  Id. at 1343.  Based on Gamboa's letters and his desire for new counsel, his attorney filed a motion to withdraw as Gamboa's counsel before the sentence hearing.  Id. at 1342.  The district court refused to grant the motion, and that attorney continued representing Gamboa through his sentence hearing.  Id. at 1343.

Gamboa appealed his sentence and contended that the district court had abused its discretion by refusing to allow his counsel to withdraw from the case before the sentence hearing.  See id.  He argued that there had been "traumatic and irreconcilable differences" between the two of them and, for that reason, we should vacate his sentence and remand the case for a new sentence hearing.  See id. (quotation marks omitted).  We rejected that contention and argument.

23

We stated in Calderon that the factors relevant to determining whether the district court abused its discretion under those circumstances were: "1) the timeliness of the motion; 2) the adequacy of the court's inquiry into the merits of the motion [for new counsel]; and 3) whether the conflict was so great that it resulted in a total lack of communication between the defendant and his counsel thereby preventing an adequate defense." Id. Finally, we noted that the defendant "must show that . . . but for counsel's continued representation at the sentencing hearing, the result of the proceeding would have been different." Id. (quotation marks omitted).

In analyzing the second and third factors, we held that the fact that Gamboa was "displeased" with his counsel was not enough to show the "much more serious breakdown in communications" required to prevent a defendant from putting forth an adequate defense. Id. We also held, in the alternative, that even if Gamboa had made that difficult showing, he had failed to "demonstrate that, in the context of the sentence hearing, he was somehow prejudiced by [his attorney] continuing to represent him." Id.; see also id. at 1344 ("There is nothing in the record or cited in Gamboa's brief that leads us to believe that the outcome of [the] sentencing hearing would have been different had different counsel represented him."). Because he could not show that he had been prejudiced, "the error was

24

harmless." See id. at 1343, 1344 .

Because the present case involves a motion for a new trial under Rule 33 and not a motion for new counsel, Calderon is not controlling, but we do find it instructive. We do not, however, find that it supports the district court's decision in this case. Even assuming that the timing factor does not weigh against Hatcher, he has not shown a breakdown in communication that prevented his counsel from presenting an adequate defense. Especially in light of what little they had to work with, we fail to see how the defense that counsel did present was not adequate. We also fail to see how but for the breakdown in the relationship between Hatcher and his counsel there is any reasonable probability that the result of the trial would have been different. We do not foreclose the district court from exploring those questions on remand, but if it reaches a conclusion different from the one that seems apparent to us, it should enter findings supporting and explaining its conclusion.

As to the prejudice component of the inquiry, it is true that in extreme circumstances prejudice may be presumed. Cf. Hunter v. Moore, 304 F.3d 1066, 1069 (11th Cir. 2002) ("An ineffective assistance claim should be analyzed under Cronic, rather than Strickland, if the defendant either 'is denied counsel at a critical stage of his trial' or if 'counsel entirely fails to subject the prosecution's

25

case to meaningful adversarial testing.'" (quoting United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047 (1984))). But Hatcher had representation by counsel at every critical stage of his trial, and his attorneys meaningfully tested the government's case. They filed numerous pretrial motions, including a severance motion, a motion to dismiss the indictment, and motions challenging specific evidence that the government planned to introduce at trial. They argued vigorously in their opening and closing statements that Hatcher was innocent and had merely been in the wrong place at the wrong time. Through cross-examination, and to the extent that they could, they called into question the credibility of some of the government's key witnesses and pointed out some discrepancies and holes in the government's evidence. They also introduced testimony from a defense witness who provided the jury with a reason why Hatcher would have been in the vicinity of the parking lot on the day of his arrest other than to sell crack cocaine. This does not appear to us to be a case in which prejudice may be presumed. If the district court on remand thinks that it is, the court should explain why.

It may be that the district court's order granting Hatcher a new trial is based primarily on its belief that because his relationship with his counsel was not good and they did not communicate well, Hatcher did not get as good a defense as he

26

would have under better circumstances.  We have serious questions about whether a new trial may properly be granted on that basis, but if the district court believes that one can be, it can do so on remand; if it does and the government disagrees, the government can appeal the decision.   The district court is also free on remand to enter an order denying Hatcher a new trial (and in due course sentence him).  If the district court does that, Hatcher can appeal the resulting judgment. Whatever the district court decides to do on remand, we would appreciate it making findings on the questions we have posed throughout this opinion in case either party does file another appeal in the matter.  Of course, the court may conduct another hearing if it believes that one is necessary to answer those questions.

## IV.

The district court's order granting Hatcher a new trial is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.