[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10557

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DANYEL MICHELLE WITT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:19-cr-00077-TKW-MJF-8

_____

Before NEWSOM and MARCUS, Circuit Judges, and MIDDLEBROOKS,*
District Judge.

NEWSOM, Circuit Judge:

Danyel Witt was indicted, tried, convicted, and sentenced to 28 months' imprisonment for her part in a broader scheme to defraud the federal government out of relief funds intended for farmers affected by drought and fire. She challenges both her conviction and her sentence. As to her conviction, she contends that the evidence preponderated against a guilty verdict such that the district court abused its discretion when it denied her motion for a new trial. As to her sentence, she asserts that her bottom-of-the-Guidelines term of imprisonment is substantively unreasonable. Neither argument is persuasive. We affirm.

## I

## A

The United States Department of Agriculture administers a relief program known as the Livestock Forage Disaster Program ("LFP"), which provides benefits to livestock producers for losses caused by drought or fire on grazing lands. In 2016, Holmes County, Florida experienced a drought, and farmers in that area became eligible for LFP benefits. When that happened, Duane Crawson—whose position as the County Executive Director for

---

* Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, sitting by designation.

the Farm Service Agency put him in charge of overseeing the LFP's administration—cooked up a scheme. Leveraging his position, Crawson recruited people to file false claims on the understanding that they'd pay him a kickback. All in, Crawson admitted to stealing around $400,000 from the government.

Witt was one of the individuals Crawson recruited into his scheme. She admitted to receiving a total of $9,661 of federal funds. The money arrived in two payments—the first was for $2,885, relating to an LFP application in Witt's name; the second for $6,776, relating to an application in the name of Sayge Evans, Witt's then-18-year-old daughter.

On the first application, Witt claimed a 100% ownership stake in 50 adult cows and bulls, 15 non-adult cows and bulls that were 500 pounds or more, and 45 goats. Thomas Graham—Witt's stepfather—was listed as the owner of the land, and Witt was listed as the tenant and "producer." Although it's uncontested that Witt received the funds, the application that the government introduced into evidence was unsigned.

Witt's mother, Brinel Graham, testified that Witt lived on the Grahams' farm in 2017. She also testified that, although the Grahams owned goats and donkeys, Witt didn't own—nor did she have permission to claim that she owned—any of the livestock on

the farm.  She also testified that there were no cows on the property.

The second application—submitted under Evans's name—claimed 100% ownership in 115 adult cows and bulls and 40 non-adult cows and bulls that were 500 pounds or more.  Evans testified, however, that she didn't own any of the livestock listed on the application (or any livestock at all, for that matter).  Evans also denied ever representing that she owned any livestock and claimed that she never received (nor was she aware of) the $6,776 payment that the government issued.

Relatedly, Evans testified that her mother had encouraged her to apply for a job working for Crawson.  Although she wasn't interested in the job, she agreed to apply for it because she thought her mother "was helping [her]."  Included in her application, which was dated August 3, 2017, Evans provided her social security number and address.

According to Evans's testimony, "a week or two" after she submitted her application, her mother brought her back to Crawson's office.  When they got there, Crawson came to the parking lot where he and Witt talked for several minutes.  During that conversation, Witt handed Evans a form, which Evans signed while holding it in her lap.  Although Evans thought the form was related to her job application, it was actually an income-verification form necessary for the LFP application.  Evans testified that it was completed—including her address and social security number—in somebody else's handwriting.    And   although   she   didn't

immediately recognize it when asked on the witness stand, she ultimately agreed that her signature was on the form.

Crawson pleaded guilty and acted as a cooperating witness for the government. He testified that Witt approached him and asked about the livestock program after she had seen his Facebook post explaining it. According to Crawson, he helped Witt submit her first application soon after that conversation, even though he knew that she didn't qualify for the program. He further testified that she returned to ask him to file a second claim, this time in Evans's name. In helping her with that application, he testified that he "filed the false claim in Sayge Evans' name" using her social security number that was provided by "her mother, Danyel Witt." Moreover, he stated that he was the one who had filled out the above-mentioned income-verification form, using Evans's "name, address, [and] Social Security number," which "Ms. Witt gave [him]." And he described watching Evans sign the income-verification form in the parking lot outside his office, corroborating Evans's testimony.

Unlike the rest of the participants in Crawson's scheme, Witt didn't pay him a kickback. Crawson testified that, because he "knew that [she] needed the money way more than [he] did," he didn't ask for his typical payment.

Witt testified in her own defense. She denied asking about the LFP funds and instead claimed that Crawson had approached her and suggested it. She admitted that she had agreed to submit the first application in her name without informing her parents, but

that she had done so on Crawson's assurance that she was qualified to receive the funds. She also admitted that she received the funds after submitting the application.

Witt testified that she and Crawson never discussed submitting a separate application in Evans's name. Instead, she claimed that she was first made aware of Evans's application "a long while after" by government investigators. She denied ever taking Evans to Crawson's office and supported that testimony with cell-phone tracking records. She insisted that both Crawson and Evans were lying when they testified to the contrary. But while she denied knowing about the second application, she admitted that she had received a second direct deposit from the government in early September. And she confirmed that Crawson didn't receive any of the $9,661 that the government sent her.

## B

In 2019, Witt was indicted for her part in the scheme.[1] Specifically, she was indicted for (1) conspiracy to commit wire fraud (Count One), (2) theft of government funds (Counts Seven and Nine), and (3) aggravated identity theft (Count Ten).

Along with two codefendants, Witt chose to go to trial.[2] Although the jury acquitted both of her codefendants, the jury found Witt guilty on all four counts as charged. Following the trial, she

---

[1] In total, the indictment included 38 Counts and named 29 defendants.

[2] The remaining defendants all pleaded guilty.

filed a motion for a new trial and a motion for acquittal, both of which the district court denied. The Presentence Investigation Report calculated her Guidelines imprisonment range as 8 to 14 months on Counts One, Seven, and Nine, plus a mandatory-minimum sentence of 24 months on Count Ten—which is statutorily required to run consecutively—bringing her total Guidelines range to 32 to 38 months' imprisonment. PSR at 51.

Included in the Guidelines calculation was an obstruction-of-justice enhancement, to which Witt objected. *See id.* at 44. After hearing argument on that enhancement, the district court sustained Witt's objection. That lowered her Guidelines range to 4 to 10 months on Counts One, Seven, and Nine, reducing the total range to 28 to 34 months. The district court sentenced her to a bottom-of-the-Guidelines sentence of 28 months.

At her sentencing hearing, Witt—who suffers from serious health problems—requested "house arrest" as a "substitute punishment." But the district court determined that it had "no discretion" with regard to that term of imprisonment. It concluded that it lacked the "authority to" substitute house arrest for imprisonment as to the aggravated identity-theft charge. But it clarified that, if it did have "some discretion" to alter the sentence, the "prison component [of the] sentence . . . wouldn't have been 24 months."

Witt appeals her conviction and sentence. First, she contends that the weight of the evidence preponderated in favor of a not-guilty verdict and, therefore, that the district court reversibly erred when it denied her motion for a new trial. Second, she asserts

that her sentence is substantively unreasonable because the district court should have sentenced her to house arrest rather than a traditional prison sentence.  We will address those arguments in turn.

## II

### A

Witt asserts that the district court should have granted her a new trial because "[t]he weight of the evidence preponderated . . . in favor of [a] not guilty verdict."[3]  Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).[4]  In doing so, the court

---

[3] "The decision to grant or deny a new trial motion based on the weight of the evidence is within the sound discretion of the trial court."  *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985).  We will "reverse only if [we] find[] the decision to be a clear abuse of that discretion."  *Id.*

[4] We note at the outset that the government appears to misunderstand Witt's argument.  Although the government divides its response into two parts—purporting to address the sufficiency of the evidence first (which we don't think Witt challenges) before asserting, as a "[s]econd" argument, that "the evidence did not preponderate heavily against the jury's verdict"—it conflates the analyses.  *See* Brief of Gov't at 39 (stating that the "evidence did not preponderate heavily against the jury's verdict" before citing cases "discussing the sufficiency of the evidence standard" and repeating the standard for how a court should "determin[e] if there was sufficient evidence to support a jury's verdict").  To be clear, those two inquiries are not the same.  *See Martinez*, 763 F.2d at 1312–13.  Indeed, granting a motion for a new trial occurs—albeit "rare[ly]"—precisely *when* the evidence *is* "legally sufficient" to convict.  *United States v. Brown*, 934 F.3d 1278, 1298 (11th Cir. 2019) (quotation omitted).  But because we may affirm the district court's judgment on any ground

21-10557                Opinion of the Court                9

"may weigh the evidence and consider the credibility of the witnesses." *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). But Rule 33 isn't an invitation for the court to "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.* at 1312–13. Instead, to warrant a new trial, the "evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* at 1313. That happens only "in the 'rare' 'case in which the evidence of guilt although legally sufficient is thin and marked by uncertainties and discrepancies.'" *United States v. Brown*, 934 F.3d 1278, 1298 (11th Cir. 2019) (quoting *Butcher v. United States*, 368 F.3d 1290, 1297 n.4 (11th Cir. 2004)); *accord Martinez*, 763 F.2d at 1313 ("[C]ourts have granted new trial motions based on weight of the evidence only where the credibility of the government's witnesses had been impeached and the government's case had been marked by uncertainties and discrepancies.").

Witt contends that the motion for a new trial should have been granted (1) because Crawson—the government's star witness—"was shown to be . . . compromised by his facing 180 years on 38 charges of conviction" and because he offered "conflicting[] and contradictory statements in sworn testimony," and (2) because

---

supported by the record, that error isn't fatal to the government's bottom-line position. *See Long v. Commissioner*, 772 F.3d 670, 675 (11th Cir. 2014) (per curiam).

the evidence against her "was thin." Br. of Appellant at 38–39. Neither contention is persuasive.

i

Witt's first-line argument hinges on Crawson's unreliability as a witness. First, she asserts that Crawson was "damaged" because he cooperated with the government. Thus, she contends, his testimony was inherently unreliable because he "had significant reason to testify and to lie and to implicate others." Br. of Appellant at 34. We disagree. As an initial matter, Witt introduced all of that information as impeachment evidence at trial for the jury to consider. More to the point, it simply can't be that any time the government uses a cooperating witness, that witness's testimony itself constitutes a ground for a new trial.

Moreover, Crawson's testimony was corroborated by Witt's daughter. Evans testified that Witt encouraged her to fill out a form with all of her personal-identifying information, took her to Crawson's office, and handed her what she later learned was a tax form necessary to complete the fraud, and that Witt then gave the form back to Crawson. Witt's only defense on the stand was that both Crawson and Evans were lying, which she attempted to support with some questionable phone-tracking data. The jury credited Evans's and Crawson's testimony over Witt's, and, of course, "credibility determinations are the exclusive province of the jury." *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) (alteration adopted and quotation omitted). Although the district court was permitted to consider Crawson's and Evans's credibility

in its new-trial determination, to give their statements weight (as the jury did) was not an abuse of discretion. *See Martinez*, 763 F.2d at 1312.

Witt also complains that Crawson "changed his testimony and contradicted statements made under oath." Br. of Appellant at 31. And, as already explained, inconsistent testimony is a ground on which a district court might properly grant a new trial. *See, e.g.*, *Martinez*, 763 F.2d at 1312–13. But Witt provides only one purported instance of "Crawson chang[ing] his sworn testimony," and it isn't persuasive. At trial, Crawson testified that Witt had "mentioned" to him "that she had s[een] a Facebook post that [he] had put on there explaining the livestock program," and that, after discussing the details, "she said that she wanted to sign up for the program." That testimony, Witt asserts, conflicts with one of Crawson's earlier statements, in which he claimed that Witt was "[o]ne of the first conspirators" that he "directly solicited." Her argument fails for any of several reasons.

First, those statements aren't plainly inconsistent. It's entirely possible that Crawson meant that he had "solicited" Witt by way of his Facebook page, or that—as he represented when asked on cross-examination—he had solicited her "[d]uring the conversation" he had referenced on direct examination. Second, Witt had the opportunity to expose any inconsistency and impeach Crawson on cross examination, which she attempted to do. Third, and finally, even if the jury had believed Witt's side of the story—that Crawson solicited her rather than the other way around—it would

not have undercut any of the elements required to prove her guilt. *See generally*, *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (providing the elements of a wire-fraud charge); *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013) (same for conspiracy to commit wire fraud); *United States v. Wilson*, 788 F.3d 1298, 1309 (11th Cir. 2015) (same for theft of government funds); *United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011) (same for aggravated identity theft).

Allowing the verdict to stand in the face of that arguable inconsistency—of which the jury was made aware, and which doesn't bear on an element of the conviction—is not "a miscarriage of justice." *Martinez*, 763 F.2d at 1313.

ii

Witt next asserts that the evidence against her "was thin" because her daughter's testimony "was questionable," the "claim forms were unsigned," and her phone-tracking information demonstrated that she never went to Crawson's office to have Evans sign the income-verification form. Witt asserts that Evans's testimony was "questionable" because she didn't immediately recognize her signature on the income-verification form. But that issue was explained by both Evans and Crawson—she signed it without having anything to bear down on. And Evans plainly stated that she remembered signing the form.

It's true that Government Exhibit 1—the LFP application in Witt's name—is unsigned. But even if Witt never signed the form,

that doesn't overcome the mountain of evidence indicating that she otherwise participated in the scheme. For example, she testified that she gave Crawson all of the necessary information, signed the income-verification form, received and spent the money, and thanked Crawson for helping her get it. That the application was unsigned doesn't sufficiently undermine the evidence supporting her conviction such that it would be a miscarriage of justice to allow the verdict to stand. *Martinez*, 763 F.2d at 1313.

Finally, the jury's verdict isn't fatally undermined by the phone-tracking data that, according to Witt, show that Evans and Crawson were lying on the stand when they testified that Witt brought Evans to Crawson's office. As Witt's expert acknowledged, the tracking information only reveals the location of a device—not the location of its owner. Moreover, at Witt's sentencing hearing, her expert conceded that the tracker showed that Witt "was in the vicinity of the Farm Services" building on August 31, and that based on the "data points," there was enough time for "someone to hand a series of pieces of paper through a driver's side window, a signature be obtained, and the paper be handed back." The tracking information does not sufficiently call into question Evans's and Crawson's testimony such that it would be a miscarriage of justice to allow the verdict to stand.

★ ★ ★

The weight of the evidence does not preponderate against a guilty verdict in this case. Therefore, the district court did not abuse its discretion when it denied Witt's motion for a new trial.

## B

Next, Witt contends that the sentence the district court imposed is substantively unreasonable. We disagree.[5]

A district court imposes a substantively unreasonable sentence "when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Osorio-Moreno*, 814 F.3d 1282, 1287 (11th Cir. 2016) (quotation omitted). On appeal, we should "vacate the sentence if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* (quotation omitted).

The statutory minimum for an Aggravated Identity Theft conviction is "a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1). And that term must run consecutively "with any other term of imprisonment imposed on the person under any other provision of law." *Id.* § 1028A(b)(2). Taking that statutorily mandated sentence along with the bottom-of-the-Guidelines sentence for Witt's other convictions, the district court sentenced Witt

---

[5] "We review the substantive reasonableness of a sentence for an abuse of discretion." *United States v. Osorio-Moreno*, 814 F.3d 1282, 1287 (11th Cir. 2016).

to 28 months' imprisonment. Witt *does not* assert that the overall length of the sentence is unreasonable. Instead, she contends only that the district court abused its discretion because it should have imposed home detention as a substitute "for at least a portion . . . of the 28-month custodial prison sentence." Br. of Appellant at 47.[6]

Witt's argument is based on § 5C1.1(d)(2) of the Sentencing Guidelines. That section provides that "[i]f the applicable guideline range is in Zone C of the Sentencing Table, the minimum term

---

[6] A quick clarification: District courts only "impose a *term* of imprisonment." 18 U.S.C. § 3582(a) (emphasis added). "The implementation of [that sentence] is governed by the provisions of subchapter C of chapter 229," *id.* § 3586, which states that, once a "person . . . has been sentenced to a term of imprisonment" by the court, the person "shall be committed to the custody of the Bureau of Prisons," *id.* § 3621(a). Once in the BOP's custody, "[t]he [BOP] shall designate the place of the prisoner's imprisonment." *Id.* § 3621(b). Thus, a district court does not have the authority to dictate whether a sentence is to be served in prison or in home confinement—that is left to the BOP. *See United States v. Cintron-Fernandez*, 356 F.3d 340, 345–46 (1st Cir. 2004) (observing that "the district court may have exceeded its own authority in ordering the [BOP] to substitute home confinement").

Accordingly, we think that Witt means to argue that the district court should have reduced her two-year sentence and ordered home confinement as a condition of supervised release for the remainder of the term—not that it should have kept the two-year sentence intact but ordered the BOP to fulfill part of it via home detention. And to the extent that Witt intends to challenge the district court's recommendation as to where she must fulfill that two-year term, we lack jurisdiction to review it. *See United States v. Martin*, 877 F.3d 1035, 1036 (11th Cir. 2017) (per curiam) (agreeing with the "other circuits" that the district court's "non-binding recommendations" to the BOP "are not 'final decisions' and, therefore, are not reviewable on appeal").

may be satisfied by . . . a sentence of imprisonment that includes a term of supervised release with a condition that substitutes . . . home detention . . . provided that at least one-half of the minimum term is satisfied by imprisonment." U.S.S.G. § 5C1.1(d)(2). Thus, Witt contends that the district court abused its discretion because "home detention is authorized and would be appropriate for" her.

As an initial matter, Witt's argument rests on a faulty premise because she misunderstands where her sentence falls on the sentencing table. Taking her 24-month statutorily mandated sentence together with her Guidelines range of 4 to 8 months, her "applicable guideline range" is 28 to 32 months. *See* U.S.S.G. § 5C1.1. That "applicable guideline range" falls within Zone D—not Zone C—of the sentencing table. *See id.* Ch. 5, Pt. A. And that eviscerates her only argument: "If the applicable guideline range is in Zone D of the Sentencing Table"—as opposed to a lesser Zone—"the minimum term shall be satisfied by a sentence of imprisonment." *Id.* § 5C1.1(f).

In any event, even if Witt's argument established that the district court had discretion to reduce the term of imprisonment and impose home confinement as a condition of supervised release, she cites no authority to support the conclusion that the district court abused that discretion. Instead, she cites the general notion that "[t]he party challenging the sentence bears the burden of establishing that the sentence is unreasonable in the light of both the record and the 3553(a) factors." Br. of Appellant at 45 (citing *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam)).

But, after acknowledging that burden, Witt never mentions the § 3553(a) factors or explains how the court committed reversible error when it considered them.  Accordingly, she has failed to carry her "burden of establishing that the sentence is unreasonable in the light of both th[e] record and the factors in [§] 3553(a)." *Talley*, 431 F.3d at 788.

★  ★  ★

The district court did not abuse its discretion when it denied Witt's motion for a new trial.  Neither did it abuse its discretion when it imposed a bottom-of-the-Guidelines sentence of 28 months' imprisonment.

**AFFIRMED**.